Michael N. Zundel (#3755) mnz@princeyeates.com
Glenn R. Bronson (#7362) grb@princeyeates.com
**PRINCE, YEATES & GELDZAHLER**
A Professional Corporation
City Centre I, Suite 900
175 East 400 South
Salt Lake City, UT 84111-2357
Telephone: (801) 524-1000
Attorneys for Chapter 7 Trustee, Kenneth A. Rushton

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE C.W. MINING COMPANY, doing business as Co-Op Mining Company,<br><br>Debtor. | Case No. 2:11-cv-840 TS<br><br>**APPELLANT'S OPENING BRIEF**<br><br>Bankruptcy Case No. 08-20105-RKM (Chapter 7)<br><br>Misc. Adv. Proc. No. 11-08001<br><br>[Filed Electronically]<br><br>Oral Argument Requested |
| KENNETH A. RUSHTON, Trustee,<br><br>         Plaintiff - Appellant,<br>    v.<br><br>STANDARD INDUSTRIES, INC., ABM, INC., FIDELITY FUNDING COMPANY, SECURITY FUNDING, INC., WORLD ENTERPRISES, a Utah Corporation, WORLD ENTERPRISES, a Nevada Corporation, UTAHAMERICAN ENERGY, INC., C.O.P. COAL DEVELOPMENT COMPANY, HIAWATHA COAL COMPANY, INC., ANR, INC., PAUL KINGSTON, an individual, JOSEPH O. KINGSTON, an individual, CHARLES REYNOLDS, an individual, JOHN DAVID KINGSTON, JR., an individual, RAILCO, INC., A-FAB ENGINEERING, INC., LATTER DAY CHURCH OF CHRIST, also known as Latter Day Church of Jesus Christ, INTERMOUNTAIN POWER AGENCY, | |

COMMONWEALTH COAL SERVICES, INC., NEVADA POWER COMPANY, TENNESSEE VALLEY AUTHORITY, ATTCO TRUCKING COMPANY, INC., doing business as CTC Trucking, CTC Trucking LLC, MOUNTAIN COIN MACHINE DISTRIBUTORS, NINTH STREET DEVELOPMENT, LLC, NINTH STREET, INC., RACHEL YOUNG, JAMES YOUNG, JESSICA YOUNG, CARL E. KINGSTON, as Trustee under Deed of Trust, COALT, INC., N.W.R. LIMITED PARTNERSHIP, N.U.R., INC., FOUR CORNERS PRECISION MFG. CO., D.U. COMPANY, INC., SMC ELECTRICAL PRODUCTS, INC., BECKER MINING AMERICA, INC., L.A. MILLER, GRAYMONT WESTERN US, INC., AMERICA WEST MARKETING, INC., SECURITY FUNDING COMPANY, NATIONAL BUSINESS MANAGEMENT, INC., doing business as NBM, RUTH BROWN, doing business as NBM, HOUSE OF PUMPS, INC., and TRIMAC TRANSPORTATION CENTRAL, INC.

Defendants - Appellees.

## **TABLE OF CONTENTS**

STATEMENT OF APPELLATE JURISDICTION ................................................... 1

STATEMENT OF ISSUES AND STANDARD OF REVIEW ............................... 1

STATEMENT OF THE CASE ................................................................................. 4

STATEMENT OF FACTS ....................................................................................... 8

SUMMARY OF ARGUMENT ............................................................................. 22

ARGUMENT ......................................................................................................... 26

I.     The Controlling Law Regarding "Property of the Estate" Under § 541(a) of the Bankruptcy Code. ..................................................................................... 26

      a.     Under § 541(a), "Property of the Estate" Is a Very Broad Concept That Includes Every Conceivable Interest of the Debtor Recognized by State Law As of the Date of the Petition. ................................................. 26

      b.     Under § 541(a)(6), Property of the Estate Also Includes, Post-Petition, All "Proceeds," "Product" and "Profits" of Property of the Estate – Concepts Which Are Similarly Broad Covering Anything of Value Derived or Generated From Property of the Estate. ....................... 28

II.    Under Utah Law, As of the Petition Date, the Debtor Had An Interest In the Coal *In Situ* and a Contingent and Equitable Interest In the Severed Coal, and It Had Numerous Other Interests From Which the Severed Coal Was Also Derived. ......................................................................................... 30

      a.     The 1997 Operating Agreement Was Property of the Estate and Gave the Debtor an Interest In the Coal *In Situ*.  The Severed Coal Was Proceeds, Product or Profits of That Interest. ................................. 30

      b.     The Severed Coal Was Also Property of the Estate As Proceeds of the DOGM Permit, the Reclamation Bond, the BLM R2P2, and the Debtor's Equitable Interest Created by Its Expenditures In Preparing the Second Longwall Panel for Extraction. ..................................... 38

      c.     The Severed Coal Is Property of the Estate Because the Debtor Is At Least the Equitable Owner of the Severed Coal Because It Has Borne the Burdens of Ownership, Including the Obligation to Pay Royalties. .......... 40

III.   The Bankruptcy Court Erred When It Relied on *Benton* to Cut Off the Debtor's Interest In the Severed Coal and Did Not Follow Federal Law to Determine That the Severed Coal Was Property of the Estate. .................................. 41

a.      The Automatic Stay of § 362(a) Protects All Property of the Estate and Renders All Unauthorized Actions to Exercise Control Over Such Property "Void and Without Effect." ............................................................. 41

b.      All Actions of COP and Hiawatha – Including Removing and Selling the Coal to the Coal Purchasers – Are Void and Without Adverse Effect on the Estate's Legal Rights. ............................................................. 43

c.      The Bankruptcy Court Erred When It Relied Exclusively on *Benton* and Failed to Consider Important Federal Interests Underlying the Automatic Stay In Protecting All Interests of the Debtor for the Benefit of All Creditors. ............................................................................................. 46

CONCLUSION ........................................................................................................ 49

STATEMENT OF REASONS FOR ORAL ARGUMENT ................................... 50

STATEMENT OF RELATED CASES ................................................................. 51

## TABLE OF AUTHORITIES

### Cases

*Anderson v. City of Bessemer City,* 470 U.S. 564 (1985)..........................................................4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................................43

*Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258 (10th Cir. 2008) ..................................................8

*Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190 (10th Cir. 2002) ...................27

*Benton v. State of Utah*, 709 P.2d 362 (Utah 1985) ........................................................passim

*Bonds v. Carter,* 75 S.W.3d 192 (Ark. 2002).........................................................................31

*Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512 (2d Cir.1985) ..............................29

*Butner v. United States*, 440 U.S. 48 (1979) ....................................................................27, 46

*C.O.P. Coal Dev. Co. v. C.W. Mining Co. (In re C.W. Mining, Co.)*, 641 F.3d
1235 (10th Cir. 2011) .......................................................................................................10

*C.O.P. Coal Dev. Co. v. C.W. Mining, Co. (In re C.W. Mining, Co.)*, 422 B.R.
746 (10th Cir. B.A.P. 2010)................................................................................................8

*Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.),* 82 F.3d 956 (10th Cir.
1996).....................................................................................................................................4

*Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371 (10th Cir. 1990) .......................42, 44

*First Security Bank of Utah v. Creech*, 858 P.2d 958 (Utah 1993) .......................................38

*Goldston v. United States (In re Goldston)*, 104 F.3d 1198 (10th Cir. 1997) .......................43

*Gonzales v. Beery (In re Beery)*, 452 B.R. 825 (Bankr. D.N.M. 2011)..................................42

*Holt v. City of Montgomery*, 102 So. 49 (Ala. 1924)..............................................................31

*In re Barnes*, 276 F.3d 927 (7th Cir. 2002) .....................................................................29, 47

*In re Calder*, 94 B.R. 200 (Bankr.D.Utah 1988) ..................................................................29

*In re Calder,* 973 F.2d 862 (10th Cir. 1992) .........................................................................29

*In re Dittmar*, 618 F.3d 1199 (10th Cir. 2010)................................................................28, 36

*In re Ford*, 574 F.3d 1279 (10th Cir. 2009)..........................................................................27

*In re KAR Dev. Assocs.*, 180 B.R. 597 (Bankr. D. Kan. 1994) .............................................40

*In re Nejberger*, 934 F.2d 1300 (3d Cir. 1991) ...............................................................27, 47

*In re O'Dowd*, 233 F.3d 197 (3d. Cir. 2000).........................................................................49

*In re Owens,* 27 B.R. 946 (Bankr. E.D. Mich. 1983) ...........................................................41

*In re Taronji*, 174 B.R. 964 (Bankr. N.D. Ill. 1994)............................................................29

*In re Yonikus*, 996 F.2d 866 (7th Cir. 1993).........................................................................28

*Johnson v. Flowers*, 228 P.2d 406 (Utah 1951) ...................................................................35

*Jones Cut Stone Co. v. New York,* 166 N.Y.S.2d 742 (1957)...........................................36, 37

*Jubber v. Ruiz (In re Ruiz)*, 455 B.R. 745 (10th Cir. B.A.P. 2011)..................................27, 44

*Jubber v. Search Market Direct, Inc. (In re Paige)*, 413 B.R. 882 (Bankr. D.
Utah 2009).........................................................................................................................43

*Kalb v. Feuerstein*, 308 U.S. 433 (1940)...............................................................................42

*Keller v. Southwood North Medical Pavilion, Inc.*, 959 P.2d 102 (Utah 1998)....................31

*Midkiff v. Stewart (In re Midkiff)*, 342 F.3d 1194 (10th Cir. 2003).........................................4

*Musso v. Ostashko*, 468 F.3d 99 (2d Cir. 2006) ....................................................................42

*Olah v. Baird (In re Baird)*, 567 F.3d 1207 (10th Cir. 2009)................................................28

v

*Parks v. FIA Card Services, N.A. (In re Marshall)*, 550 F.3d 1251 (10th Cir. 2008) ............................................................................................ 26, 46

*Salve Regina College v. Russell*, 499 U.S. 225 (1991) ...................................... 4

*Sproul v. Gilbert*, 359 P.2d 543 (Or. 1961) ................................................. 31

*Standard Industries, Inc. v. Aquila, Inc. (In re C.W. Mining, Co.)*, 625 F.3d 1240 (10th Cir. 2010) ....................................................................... 12

*Travelers Cas. and Surety Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443 (2007) ...................................................................................... 46

*United States v. Atomic Fuel Coal Co.*, 383 F.2d 1 (4th Cir. 1967) .................. 31

*United States v. Cardall*, 885 F.2d 656 (10th Cir. 1989) ................................ 28

*United States v. Messner*, 107 F.3d 1448 (10th Cir. 1997) .............................. 28

*United States v. Rauer*, 963 F.2d 1332 (10th Cir. 1992) ................................ 28

*United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983) .............................. 27

*United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188 (4th Cir. 1986) ......... 29, 38

*Wheeler v. Milbank (In re Wheeler)*, 431 B.R. 158 (N.D. Tex. 2005) ............. 29, 47

*Williamson v. Jones (In re Montgomery)*, 224 F.3d 1193 (10th Cir. 2000) ......... 27

*Yorke v. Citibank, N.A. (In re BNT Terminals, Inc.)*, 125 B.R. 963 (Bankr. N.D.Ill. 1991) ........................................................................... 42

*Young v. Higbee Co.*, 324 U.S. 204 (1945) ................................................ 49

## Statutes

11 U.S.C. § 362 ................................................................... 41, 44, 47

11 U.S.C. § 362(a) ............................................................... 43, 44, 45

11 U.S.C. § 363 ............................................................................ 44

11 U.S.C. § 541 ....................................................................... passim

11 U.S.C. § 541(a) .................................................................... passim

11 U.S.C. § 541(a)(1) ........................................................ 6, 26, 29, 33

11 U.S.C. § 541(a)(6) .................................................................. passim

11 U.S.C. § 542 ............................................................................ 36

11 U.S.C. § 542(a) ......................................................................... 44

11 U.S.C. § 549 ............................................................................ 36

11 U.S.C. § 549(a) ......................................................................... 44

11 U.S.C. § 550 ............................................................................ 36

11 U.S.C. § 550(a) ......................................................................... 44

11 U.S.C. § 552(b) ......................................................................... 38

11. U.S.C. § 363(b)(1) ..................................................................... 44

28 U.S.C. § 158(a)(1) ....................................................................... 1

## Other Authorities

1978 U.S.Code Cong. & Admin.News 5787 ............................................ 29

*Black's Law Dictionary* 1483 (6th ed. 1990) ............................................ 31

*Black's Law Dictionary* 949 (7th ed. 1999) .............................................. 33

H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977) ................................ 42

H.R. Rep. No. 595, 95th Cong., 1st Sess. 368 (1977) ................................ 29

S. Rep. No. 989, 95th Cong. 2d Sess. 82 (1978) ...................................... 29

S. Rep. No. 989, 95th Cong., 2d Sess. 54-55 (1978) ............................................................. 42

**Treatises**

3 COLLIER ON BANKRUPTCY ¶ 362.03, n.6 (Alan N. Resnick & Henry J. Sommers eds. 16th ed.)........................................................................................................ 42

## STATEMENT OF APPELLATE JURISDICTION

Pursuant to 28 U.S.C. § 158(a)(1) and (c), this Court has jurisdiction over this appeal by Kenneth A. Rushton, Chapter 7 Trustee ("**Trustee**"), from the bankruptcy court's final *Order Granting Defendants' Motions for Summary Judgment In Hiawatha Coal Proceeding, Denying Motion of Trustee for Partial Summary Judgment, and Dismissing Defendants' Rule 56(d) Motion as Moot*, entered on July 29, 2011, and from the bankruptcy court's *Statement of Undisputed Facts and Conclusions of Law In Support of Order Granting Summary Judgment*, entered July 29, 2011 (the "**8001 Order**" or "**Order**"). (Trustee's Appendix ("**App**.") 1106-24.)  The Trustee timely filed his Notice of Appeal on August 12, 2011. (App. 1125-31, Notice of Appeal.)

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

1.     Whether the bankruptcy court erred in concluding as a matter of law that the Severed Coal – *i.e.*, coal substantially prepared for removal by the Debtor's mining activities pre- and post-petition but ultimately removed from the Mine by Hiawatha while in wrongful possession of the Mine post-petition – is not "proceeds, product … or profits of or from property of the estate," under 11 U.S.C. § 541(a), where property of the estate includes the 1997 Operating Agreement, the DOGM Permit, the Reclamation Bond, the BLM Resource Recovery and Protection Plan, and the interest created by the Debtor's activities in preparing the Severed Coal for removal.

2.     Whether the bankruptcy court erred in concluding as a matter of law that the Severed Coal is not property of the estate, under 11 U.S.C. § 541(a), where the bankruptcy court had already ruled: (a) that the Debtors' exclusive rights under the 1997 Operating

Agreement to possess the Mine and remove coal were property of the estate; (b) that Hiawatha, in concert with COP and Standard, violated the automatic stay by taking possession of the Mine and mining and removing approximately 1,019,347 tons of coal; and (c) that Hiawatha, COP and Standard violated the automatic stay by selling and delivering most of that coal to third parties.

3.      Whether the bankruptcy court erred in concluding as a matter of law that the Severed Coal is not property of the estate, under 11 U.S.C. § 541(a), where the Debtor remained, under its contract with Hiawatha, the "operator and permittee" of the Mine.

4.      Whether the bankruptcy court erred in concluding as a matter of law that the Severed Coal is not property of the estate, under 11 U.S.C. § 541(a), where it is undisputed that the Debtor has borne the burdens of ownership of the Severed Coal, including the obligation to pay royalties.

5.      Whether the bankruptcy court erred in concluding as a matter of law that proceeds of the Severed Coal are not property of the estate under 11 U.S.C. § 541(a).

6.      Whether the bankruptcy court erred when it recited as "undisputed facts" that Hiawatha severed the Severed Coal and that the Debtor did not sever the Severed Coal, where it is undisputed that the Debtor contributed substantially to the process of severing the coal, expended millions of dollars pre- and post-petition in preparing the coal for extraction, and where an inference favorable to the Debtor should have been made that the Debtor participated in severing the Severed Coal; and where all actions of Hiawatha toward severing the Severed Coal are void in violation of the automatic stay.

7.      Whether the bankruptcy court erred in concluding as a matter of law that the 1997 Operating Agreement gave the Debtor no interest in the coal *in situ* which could be recognized as property under 11 U.S.C. § 541(a).

8.      In determining the Severed Coal is not property of the estate under 11 U.S.C. § 541(a), whether the bankruptcy court erred in relying on *Benton v. State of Utah*, 709 P.2d 362 (Utah 1985)  – which holds that a lessee under a mineral lease does not have sufficient possessory rights to maintain a conversion action against one who wrongfully severs minerals subject to the lease – rather than applying the broad concept of property of the estate required by § 541(a).

9.      In determining that the Severed Coal is not property of the estate, whether the bankruptcy court erred in analyzing the interplay between bankruptcy law and state law, where there is an important federal interest in ensuring that property of the estate is defined broadly to include all interests existing as of the petition date and where there is also an important federal interest in protecting property of the estate from automatic stay violations.

10.     Whether the bankruptcy court erred when it denied the Trustee's request that the estate be declared the owner of the Severed Coal because the coal was removed in violation of the automatic stay.

11.     Whether the bankruptcy court erred when it rejected the Trustee's argument that neither Hiawatha, COP nor Standard ever gained any legal interest in the Severed Coal because their actions to possess the Mine and remove the coal were void *ab initio* since the bankruptcy court had already determined that such actions violated the automatic stay.

12.     Whether the bankruptcy court erred when it rejected the Trustee's argument that Hiawatha's, COP's and Standard's attempts to transfer the Severed Coal were also void because they never obtained any legal interest in the Severed Coal.

Standard of Review.   "Where… [t]here are no factual disputes and the issues on appeal pertain to the proper application of bankruptcy statutes and interpretation of case law, [appellate] review is *de novo.*"  *Midkiff v. Stewart (In re Midkiff)*, 342 F.3d 1194, 1197 (10th Cir. 2003) (citation omitted).  *De novo* review requires an independent determination of the issues, giving no deference to the bankruptcy court's decision.  *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991).   Factual findings are reviewed under a "clearly erroneous" standard.  *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.),* 82 F.3d 956, 959 (10th Cir. 1996).  "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, [the court is] left with the definite and firm conviction that a mistake has been made."  *Id.* (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985)).

## STATEMENT OF THE CASE

C.W. Mining Company (the "**Debtor**") operated the Bear Canyon Coal Mine (the "**Mine**") pursuant to a 1997 Operating Agreement (the "**1997 Operating Agreement**" or "**Lease**") with the owner of the Mine, C.O.P. Coal Development Company ("**COP**"). The 1997 Operating Agreement gave the Debtor the exclusive right to mine, remove and sell coal from the Mine.  A creditor commenced this bankruptcy case on January 8, 2008, by filing an involuntary chapter 11 petition in connection with its efforts to collect on a $24 million dollar judgment against the Debtor.  The Order for Relief was entered in

4

September 2008.  The case was converted to one under chapter 7, and the Trustee was appointed in November 2008.  As of the petition date, the assets of the estate included, *inter alia*, the Debtor's exclusive rights to mine and remove coal under the 1997 Operating Agreement, the Debtor's mining permits, bonds and mining equipment, and the coal in the Mine (*in situ*), much of which the Debtor had substantially prepared for removal and sale.  The Debtor was in possession of the Mine in 1997 under the Lease and continued, post-petition, to mine and remove coal until July 2008, when COP purported to terminate the 1997 Operating Agreement with the Debtor and enter into a new operating agreement with Hiawatha Coal Company, Inc. (the "**Hiawatha Operating Agreement**") to take over the Debtor's operations.  In July 2008, Hiawatha took control of the Debtor's equipment and employees and took possession of the Mine and continued mining, removing and selling coal.  The bankruptcy court has previously ruled that the Debtor's exclusive rights to mine and remove coal were property of the estate and that both COP's and Hiawatha's activities in entering into the Hiawatha Operating Agreement, and Hiawatha taking possession of the Mine and removing and selling coal, violated the automatic stay.  Accordingly, the court further concluded that the Hiawatha Operating Agreement was "void" as an exercise of control over property of the estate in violation of the stay.  Ultimately, the Trustee recovered the Mine from Hiawatha and sold it to a third party, but not before Hiawatha removed a substantial amount of coal from the Mine and sold it to third parties.  This coal, referred to as the "**Severed Coal**," consists of approximately 1,019,000 tons of coal mined by Hiawatha in violation of the automatic stay.

5

On August 31, 2009, the Trustee initiated Adversary Proceeding 09-02375 ("**COP II**") asserting various recovery and avoidance causes of action against COP and Hiawatha, and against numerous entities that purchased the Severed Coal from Hiawatha (the "**Coal Purchasers**").  Specifically, in COP II the Trustee seeks to recover from the Coal Purchasers, under §§ 542,[1] 549[2] and 550[3] of the Bankruptcy Code,[4] the Severed Coal or the value of such coal.  In order for the Trustee to maintain his claims against the Coal Purchasers, the Severed Coal must be "property of the estate" under § 541(a).  Section 541(a)(1) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  Section 541(a)(6) provides that all "proceeds, product . . . or profits of or from property of the estate" are also property of the estate.  In addition to COP II, the Trustee brought several other adversary proceedings in which whether the Severed Coal is property of the estate may be an issue.

Understanding the broad impact in this bankruptcy case of determining the threshold issue of whether the Severed Coal was property of the estate, on February 22, 2011, the bankruptcy court created Miscellaneous Adversary Proceeding 11-8001 ("**11-8001**"),

---

[1] Section 542(a) requires: "an entity … in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease … shall deliver to the trustee, and account for, such property or the value of such property."

[2] Under § 549, the Trustee "may avoid" any unauthorized, post-petition "transfer of property of the estate."

[3] Under § 550(a), "to the extent that a transfer is avoided under section … 549 …, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – the initial transferee … or any immediate or mediate transferee of such initial transferee."

[4] Unless otherwise specified, all statutory references are to Title 11 of the United States Code (the "**Bankruptcy Code**").

consolidating COP II and certain adversary proceedings for the limited purpose of resolving in one proceeding all common questions related to whether the Severed Coal and its proceeds were property of the estate.

On March 4, 2011, the Trustee filed a motion for partial summary judgment in 11-8001 seeking a judgment that the Severed Coal was property of the estate under § 541(a). Also on March 4, 2011, the Coal Purchasers filed cross motions for summary judgment, seeking judgment that the Severed Coal was not property of the estate.  On April 15, 2011, COP and Hiawatha filed similar motions for partial summary judgment.

On July 29, 2011, the bankruptcy court entered its *Order Granting Defendants' Motions for Summary Judgment, Denying Motion of Trustee for Partial Summary Judgment, and Dismissing Defendants' Rule 56(d) Motion as Moot* and the accompanying *Statement of Undisputed Facts and Conclusions of Law In Support of Order Granting Summary Judgment* (the "**8001 Order**" or "**Order**"), wherein the court determined that the Severed Coal and its proceeds were not property of the estate.  The court relied exclusively on *Benton v. State of Utah*, 709 P.2d 362 (Utah 1985), to conclude that as of the petition date the Debtor had no interest in the coal *in situ* under the 1997 Operating Agreement and that it had no interest in what became the Severed Coal or its proceeds because the Debtor did not "sever" the Severed Coal.  In short, the court ruled that neither the coal *in situ* nor the Severed Coal were ever property of the estate.

The Trustee filed Notices of Appeal in 11-8001, COP II and each of the consolidated adversary proceedings on August 12, 2011, appealing the Order to the Bankruptcy Appellate Panel for the Tenth Circuit.  Appellees subsequently elected to have this Court hear the

appeals.   All appeals have been transferred to this Court and consolidated into this proceeding.

## STATEMENT OF FACTS

1.      Between late 2003 and 2005, a contract dispute arose between the Debtor and Aquila, Inc. ("**Aquila**").  Aquila filed a lawsuit against the Debtor in federal district court in Utah and obtained a $24 million judgment on October 30, 2007.  *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258 (10th Cir. 2008) (upholding judgment).   Immediately thereafter, Aquila commenced collection efforts.  *See C.O.P. Coal Dev. Co. v. C.W. Mining, Co. (In re C.W. Mining Co.)*, 422 B.R. 746, 749 (10th Cir. B.A.P. 2010).

2.      On January 8, 2008 (the "**Petition Date**"), Aquila and other petitioning creditors commenced this case under chapter 11 by involuntary petition, designating C.W. Mining Company dba Co-Op Mining Company as the Debtor (the "**Debtor**").  *Id.* at 750-51.

3.      An Order for Relief was entered on September 26, 2008. (App. 28-30, 09/26/08 Order.) The case was converted to chapter 7 on November 13, 2008 (App. 31-32, 11/13/08 Conversion Order), and the Trustee was appointed on November 19, 2008 (App. 33, Notice of Appointment).

*The Debtor's Exclusive Rights to Mine, Remove and Sell Coal Under the 1997 Operating Agreement*

4.      In March 1997, the Debtor and COP entered into the 1997 Coal Operating Agreement.  The granting provision of the 1997 Operating Agreement provides:

> Owner, in consideration of the royalties to be paid and conditions to be observed as hereafter set forth, does hereby grant unto Operator the exclusive authority to operate and control the following described tracts of land … for the term of 25 years, beginning March 1, 1997, and extending to February 28, 2022.

(App. 897, 1997 Operating Agreement.)

5.      The 1997 Operating Agreement also provides:

Operator shall have the exclusive right to, and use of the described property for purposes reasonably incident to the mining and removal of coal, including any existing underground workings or facilities heretofore placed in or upon the leased area.  Operator shall also have unrestricted use of all access roads leading to and from the described property.

(App. 897, 1997 Operating Agreement.)

6.      The 1997 Operating Agreement also provides: "[Debtor] shall diligently and continuously operate the subject property for the term hereof … [Debtor] shall conduct the operations hereunder … in a manner which will result in the ultimate maximum economic recovery of coal from the property." (App. 898, 1997 Operating Agreement.)

7.      The 1997 Operating Agreement also provides:

Owner or its agents may and shall at all reasonable times have free access to said premises and the mines, or the mines open thereon, or which may hereafter be opened thereon, and to all workings thereon for the purpose of determining whether the said property is being maintained, protected, and used in accordance with the terms of this agreement; and for the purpose of checking the tonnage of coal which may be mined and extracted by the Operator [Debtor].

From time to time, Owner may cause a survey of the mine or mines of the Operator [Debtor] to be made by some competent engineer selected by Owner for the purpose of checking the statements made by Operator of the coal removed from the premises, and of the amounts paid as royalties by reason thereof and for the purpose of determining the manner in which the mining upon the premises has been or is being performed. Operator may be present, or his duly appointed representative, at the making of any survey and shall furnish necessary men free of expense to Owner to assist Owner's said engineer in making such a survey.

(App. 898-99, 1997 Operating Agreement.)

8.      The 1997 Operating Agreement also provides: "[Debtor] shall pay all taxes with respect to [Debtor's] mining operation, equipment, and other property used by [Debtor].

[Debtor] shall pay all general state and county taxes assessed against the premises." (App. 899, 1997 Operating Agreement.)

9.      The 1997 Operating Agreement covers land that is owned in fee by COP (the "**Fee Land**") and land that COP leases from the federal government (the "**Government Land**"). (App. 795-96, Charles Reynolds 2004 Exam. Tr.)

10.     The Debtor was in possession of the Mine in 1997 and actively mined the coal on the leased property to such an extent that both COP and ANR, Inc. ("**ANR**")[5] were deemed by the BLM to have satisfied their minimum mining requirements under the Bear Canyon Logical Mining Unit. (App. 231, 09/28/09 Findings of Fact and Conclusions of Law (recognizing that ANR leases were rolled into the Debtor's existing Logical Mining Unit to save such from forfeiture for failure to satisfy federal diligence requirements).)

11.     The Debtor conducted operations at the Mine until Hiawatha took possession of the Mine in July 2008. (App. 247, 12/09/09 Findings of Fact and Conclusions of Law.)

12.     The 1997 Operating Agreement has been property of the estate, within the meaning of § 541, at all times relevant to the issues brought before this Court by this appeal. (App. 101, 04/23/09 Amended Memorandum Decision; App. 245-46, 12/09/09 Findings of Fact and Conclusions of Law; *C.O.P. Coal Dev. Co. v. C.W. Mining Co. (In re C.W. Mining, Co.)*, 641 F.3d 1235 (10th Cir. 2011).)

*Automatic Stay Violations by Hiawatha, COP and Standard*

13.     On May 9, 2008, notwithstanding the automatic stay effective as of the petition on January 8, 2008, COP effectively evicted the Debtor from the Mine by sending

_____

[5] ANR is another entity not at issue here that leased property to the Debtor.

the Debtor a notice of eviction and demanding that the Debtor vacate the Mine by July 5, 2008 unless it met all of the terms to accept a new lease agreement by June 5, 2008 (the "**Eviction Notice**"). (App. 245, 12/09/09 Findings of Fact and Conclusions of Law; App. 908, Eviction Notice.)

14.     On or about June 23, 2008, COP purported to enter into a new coal operating agreement with Hiawatha that covered the same land covered by the 1997 Operating Agreement (the "**Hiawatha Operating Agreement**"). (App. 341, AP 09-2375 Second Am. Complaint [¶36]; App. 407, AP 09-2375 Hiawatha Answer [¶36]; App. 877-86, Hiawatha Operating Agreement.)

15.     On or about July 1, 2008, Hiawatha, with assistance from COP and purporting to act under authority of the Hiawatha Operating Agreement, took possession of the Mine and commenced mining operations. (App. 342, AP 09-2375 Second Am. Complaint [¶40]; App. 407, AP 09-2375 Hiawatha Answer [¶40].)

16.     After July 1, 2008, Hiawatha, acting in concert with COP and Standard, among other things: (a) mined and removed approximately 1,019,347 tons of coal (the "**Severed Coal**") from the Mine's coal seam; (b) purported to sell and in fact delivered most of the Severed Coal to third parties, including TVA, IPA, Nevada Power and Commonwealth; and (c) after the Trustee's appointment (Nov. 19, 2008), refused to deliver possession of the Mine to the Trustee.   (App. 248, 12/09/09 Findings of Fact and Conclusions of Law.)

17.     On July 23, 2008, the bankruptcy court entered an *Order of Civil Contempt Against Standard Industries, Inc. and C.O.P. Coal Development Company for Violations of the Automatic Stay* (the "**Contempt Order**"). (App. 5-11, Contempt Order.)

18.   In the Contempt Order, the Court declared:

> 4.   Standard and COP are hereby adjudged to be in civil contempt for intentionally violating the automatic stay after having received actual notice that an involuntary petition for relief had been filed against [the Debtor].
>
> ***
>
> 9.   All actions taken by COP Coal to terminate [the Debtor's] 1997 Operating Agreement after the petition date are hereby adjudged and declared to be null and void and of no force and effect and as such the 1997 Operating Agreement was not terminated by COP Coal after the petition date and remains a valid agreement between the parties.
>
> 10.   COP Coal shall take whatever action is necessary to restore [the Debtor] to the status quo position that it was in prior [to] the unlawful actions taken by COP Coal which violated the automatic stay, including but not limited to the rescinding of all of its efforts to terminate the long-term 1997 Operating Agreement and rescinding all its post-petition demands respecting pre-petition amounts allegedly owing by [the Debtor] to COP Coal.

(App. 7-8, Contempt Order.)   The Contempt Order was affirmed on appeal.  *Standard Industries, Inc. v. Aquila, Inc. (In re C.W. Mining, Co.)*, 625 F.3d 1240 (10th Cir. 2010).

19.   Neither COP nor Hiawatha returned the Debtor to its rightful possession of the Mine premises subsequent to the Contempt Order. (App. 247-48, 12/09/09 Findings of Fact and Conclusions of Law.)

20.   In its Findings of Fact and Conclusions of Law Arising from Trial on November 16, 17, 23, and 24, 2009, the bankruptcy court again ruled that the foregoing actions by COP, Standard, and Hiawatha were void because they violated the automatic stay. The bankruptcy court ruled:

> 25.   The Court made numerous findings in the aforementioned decisions regarding the circumstances and parties' conduct before, during, and after the Purchase and Sale Agreement between the Debtor and Hiawatha was

executed, including that COP violated the automatic stay by attempting to terminate its operating agreement with the Debtor and by threatening the Debtor with eviction from the mine by letter dated May 9, 2008 (May 9 Letter).  The Court has also ruled that the 1997 Operating Agreement between COP and the Debtor, which gave to the Debtor exclusive possessory and operating rights to the mine, was in full force and effect as of the petition date and has since been an asset of this bankruptcy estate.

***

30.    The Debtor's exclusive rights under the 1997 Operating Agreement to possession of the mine premises and to mine and remove coal from the mine premises were property of the estate. As such, COP's act of entering into the Hiawatha Operating Agreement and thereby purporting to transfer those same rights to Hiawatha violated the automatic stay under § 362(a)(3) as an act "to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate" and is therefore void.

31.    On or about July 1, 2008, Hiawatha, with assistance from COP and purporting to act under authority of the Hiawatha Operating Agreement, further violated the automatic stay under § 362(a)(3) by taking possession of the mine premises and commencing mining operations to remove coal from the mine premises.

32.    In the Contempt Order, the Court declared and ordered that:

> 4.    Standard and COP Coal are hereby adjudged in civil contempt for intentionally violating the automatic stay after having received actual notice that an involuntary petition for relief had been filed against [the Debtor].
>
> ***
>
> 9.    All actions taken by COP Coal to terminate [the Debtor's] 1997 Operating Agreement after the Petition Date are hereby adjudged and declared to be null and void and of no force and effect and as such the 1997 Operating Agreement was not terminated by COP Coal after the petition date and remains a valid agreement between the parties.
>
> 10.    COP Coal shall take whatever action is necessary to restore CWM to the status quo position that it was in prior to the unlawful actions taken by COP Coal which violated the automatic stay, including but not limited to the rescinding of all of its efforts to terminate the long-term 1997 Operating Agreement . . . .

13

33.     COP violated the Contempt Order and willfully continued its violation of the automatic stay by refusing to take any action to: (a) rescind or otherwise unwind the Hiawatha Operating Agreement; (b) restore exclusive possession of the mine to the Debtor; or (c) prevent Hiawatha from taking coal from the mine in violation of the Debtor's exclusive rights under the 1997 Operating Agreement, which acts needed to be done to restore the Debtor "to the status quo position that it was in prior to the unlawful actions which violated the automatic stay, including but not limited to the rescinding of all of its efforts to terminate the long-term 1997 Operating Agreement."

34.     Since July 1, 2008, Hiawatha, acting in concert with COP and Standard, has willfully violated the automatic stay by, among other things: (a) refusing to deliver possession of the mine to Debtor or the Trustee; (b) mining and removing approximately 1,019,347 tons of coal from the mine; and (c) purporting to sell and in fact delivering most of that coal to third parties.

35.     COP also violated the Contempt Order and the automatic stay under § 362(a)(3) by participating in or facilitating the actions described in the previous paragraph.

36.     As a result of COP's inviting Hiawatha onto the mine premises, Hiawatha mined and removed a significant quantity of coal from a portion of the premises that is owned by the United States and leased by the United States to COP.

(App. 245-48, 12/09/09 Findings of Fact and Conclusions of Law.)

_The Conditional Purchase and Sale Agreement Between the Debtor and Hiawatha_

21.     On June 24, 2008, the day after COP and Hiawatha entered into the Hiawatha Operating Agreement, Hiawatha also entered into a conditional Purchase and Sale Agreement with the Debtor (the "**PSA**"), pursuant to which the Debtor agreed to sell to Hiawatha its mine related assets (excluding the 1997 Operating Agreement), provided that, and at such time as, the applicable governmental authorities approved a transfer of the Debtor's mining permits to Hiawatha, and further provided that the transfer was not, prior to closing, prohibited by court order. (App. 859-873, PSA; App. 407, AP 09-2375 Hiawatha Answer [¶41].)

22.     In the PSA, the Debtor agreed to sell to Hiawatha the Debtor's Surface Mining Control and Reclamation Permit ("**DOGM Permit**") with the Utah Division of Oil, Gas & Mining ("**DOGM**").  (App. 859-60 and 869, PSA.)

23.     The DOGM Permit was supported by a reclamation bond the Debtor had with Cumberland/Lyndon ("**Reclamation Bond**").  (App. 71-73, 03/18/09 Mem. Decision.)

24.     In the PSA, the Debtor also agreed to sell its Resource Recovery and Protection Plan ("**BLM R2P2**") with the U.S. Department of Interior, Bureau of Land Management (the "**BLM**"). (App. 859-60 and 869, PSA.)

25.     The effectiveness of the PSA was expressly contingent upon obtaining necessary third-party approvals (including various governmental entities) regarding the assets to be sold and upon there being no court order precluding such sale:

> Section 15.  Conditions to Closing.   Closing of this Agreement is subject to obtaining all necessary approvals of third parties, and there being no injunction or court order and no changes in the applicable law.

(App. 865, PSA.)

26.     Because transfer of the DOGM Permit and Reclamation Bond could not occur without DOGM and third-party permission, the PSA also provided that until transfer of the mining permits was approved, all mining would be conducted in the name of the Debtor and that the Debtor would continue as operator and permittee of the Mine:

> The transfer of assets listed in this paragraph shall include but not be limited to the permits listed on Exhibit "B" attached hereto and will be subject to any required approvals of third parties.  Seller [Debtor] agrees to maintain all permits and continue as operator and permittee, until such time as Buyer obtains any and all required approvals.

(App. 860, PSA.)

27.     On January 26, 2009, Steve Alder, an attorney employed by DOGM, represented to the bankruptcy court that even though Hiawatha was in possession of the Mine, DOGM always considered the Debtor to be the "permittee" of the Mine. (App. 35-36, 01/26/09 Hearing Tr.)

*The Preservation Order*

28.     Aquila considered the 1997 Operating Agreement to be a valuable asset and was concerned that the Debtor might attempt to terminate the Lease or transfer other assets to prevent Aquila from recovering on its judgment.  *In re C.W. Mining*, *supra*, 422 B.R. at 750.

29.     On August 7, 2008, the bankruptcy court signed its *Order Denying In Part and Granting In Part Motion of Aquila, Inc. for Order Preserving and Protecting Assets of Bankruptcy Estate and Requesting Notice and Hearing In Connection With Debtor's Purported Sale of Substantially All Operating Assets to a Related Entity* (the "**Preservation Order**"), wherein it:

> ORDERED that any attempt from this point forward to transfer, sell or to seek approval of the transfer or sale of the Debtor's assets to Hiawatha Coal Mining Company (Hiawatha) or any other party outside the ordinary course of the Debtor's business must be set for hearing and properly noticed out to all parties pursuant to the Bankruptcy Code and Bankruptcy Rules.  This order applies to any portion of the Sale Agreement [PSA] between the Debtor and Hiawatha that has not yet been consummated including the approval of the sale by various governmental agencies and regulatory agencies or commissions.

(App. 25, 08/08/08 Order.)

*The Conditional Sale Under the PSA Never Became Effective, and the Mining Permits Were Never Transferred*

30.     The PSA never became effective because Hiawatha never received the necessary approvals from the applicable government authorities.  (App. 20, 08/08/08 Mem. Decision; App. 72-75, 03/18/09 Mem. Decision.)

31.     In denying a motion Hiawatha filed for relief from the automatic stay in order to consummate the conditional sale under the PSA, the bankruptcy court explained that Hiawatha never transferred the DOGM Permit into its own name and that the conditional sale under the PSA was never consummated:

> . . . [Hiawatha's] arguments demonstrate Hiawatha's misunderstanding of the court's Preservation Order.
>
> After entry of the Preservation Order, the Debtor was required to seek court approval of any transfer of the Debtor's property not yet consummated.  Finley testified that DOGM refused to transfer the mining permit to Hiawatha because Hiawatha had been unable to obtain transfer of the Debtor's reclamation bond to Hiawatha.  Hiawatha was unable to get the reclamation bond transferred because of the Preservation Order.  He also testified that Linden/Cumberland is only waiting for this court's approval before it transfers the reclamation bond to the Debtor.  The Sale Agreement was executed on June 24, 2008 and the Preservation Order was not issued until August 8, 2008.  The Debtor had 45 days from the alleged sale date until the entry of the Preservation Order to effectuate any purported transfer that occurred under the terms of the Sale Agreement.  This would have included the transfer of the reclamation bond from the Debtor to Hiawatha as well as any interest the Debtor had in the DOGM permit.  It cannot be disputed that one of the most valuable assets of a mine operator is a permit to operate the mine.  And yet, by August 8, 2008, the Debtor and Hiawatha had failed to transfer the reclamation bond upon which the mining permit was based, and the Preservation Order clearly restrained the Debtor from doing so without further court approval.

(App. 72-73, 03/18/09 Mem. Decision.)

32.     In the same decision, the court denied Hiawatha's request for leave to complete its purchase of the Debtor's assets under the PSA and in so doing concluded:

> . . . [I]t is inescapable that Hiawatha voluntarily placed itself in this position with full knowledge of Debtor's bankruptcy case and assumed the risk that the transaction would not be concluded as Hiawatha planned.

(App. 74, 03/18/09 Mem. Decision.)

33.     In a separate decision issued the same day, the bankruptcy court again affirmed that the 1997 Operating Agreement was in effect as of the petition date and not transferred post-petition:

> . . . the [Operating] Agreement was still in effect between the Debtor and COP when the order for relief was entered, the Debtor's rights under the [Operating] Agreement were not sold post-petition. . ."

(App. 65, 03/18/09 Mem. Decision.)

34.     Hiawatha never received the BLM's approval to transfer the BLM R2P2 into its name.   (App. 942, Hiawatha's 8001 MSJ Mem. ("Hiawatha does not dispute that Hiawatha was unsuccessful in transferring the Reclamation Bond into its own name").)

*The Debtor's Preparation of the Severed Coal for Extraction*

35.     As early as 2001, the Debtor had "plans to acquire the use of a longwall mining system and to mine coal where feasible using the longwall mining method." (App. 769, Advance Payment Agreement.)

36.     The Debtor spent several years preparing the Mine so that the coal reserves in the Mine could be mined using the longwall method of mining.  (App. 819-20, January 2011 Expert Report of Carl Pollastro of Norwest Corporation ("**2011 Norwest Report**").)

37.     The Debtor began producing coal by the longwall method, for the first time, a few months prior to the Petition Date. (App. 820, 2011 Norwest Report.)

38.     Under the longwall method, large "panels" of coal are prepared for extraction by cutting parallel mine tunnels around all four sides of a large rectangular block or "panel"

of coal so that the longwall equipment can be installed at one end and the coal extracted from the "panel" in a continuous fashion until the opposite end of the panel is reached, whereupon the procedure is repeated with the next panel of coal which has been prepared for extraction while coal was being extracted from the first panel. (App. 819-20, 2011 Norwest Report.)

39.     The Debtor finished extracting coal from its first longwall panel (the "**First Longwall Panel**") in mid-to-late May 2008 (post-petition).  While extracting coal from the First Longwall Panel, the Debtor was simultaneously preparing the second longwall panel for extraction (the "**Second Longwall Panel**").  (App. 818-20, 2011 Norwest Report.)

40.     When Hiawatha took possession of the Mine, the Second Longwall Panel was within two months of completion, at which time extraction of coal could begin.  The Second Longwall Panel contained approximately 850,000 mineable tons of coal using the longwall method. (App. 818, 2011 Norwest Report.)

41.     The Second Longwall Panel was prepared by the Debtor both pre-petition and during the gap period at a cost to the estate of millions of dollars.  (App. 819, 2011 Norwest Report  ("The total cost expended by the Debtor to develop the Second [Longwall] Panel, therefore, is between $16.52 million and $14.02 million"); App. 1050-51, 8001 Hearing Tr. (Coal Buyers' counsel acknowledged "I don't think we can dispute that money was put in to the mine").)

42.     Of the Severed Coal, approximately 850,000 tons were removed by Hiawatha from the Second Longwall Panel, and approximately 175,000 tons were removed in finalizing preparation of the Second Longwall Panel and in preparation of the Third Longwall Panel.  (App. 818, 2011 Norwest Report.)

*The DOGM Cessation Order*

43.     On February 5, 2009, while Hiawatha was in the process of extracting coal from the Second Longwall Panel, it received a Cessation Order from the Utah Division of Oil, Gas & Mining ("**DOGM Cessation Order**") because Hiawatha had failed to obtain DOGM's permission to transfer the DOGM Permit into its name and because it had failed to transfer the Reclamation Bond into its name. (App. 811-12, DOGM Cessation Order.)

44.     The Cessation Order provided: "[a]t the conclusion of mining the current long-wall panel … no further coal mining will be permitted until violations resulting in the Cessation Order have been fully resolved." (App. 812, DOGM Cessation Order.)

*Continuing Liabilities of the Debtor for the Severed Coal*

45.     In connection with the sale of this estate's Mine-related assets to Rhino Energy, and litigation of COP's Cure Claim, the bankruptcy court ordered the estate to hold in escrow, and the estate has in fact held, $1,320,930.89 of the sale proceeds to be available to pay Minerals Management Service ("**MMS**") any underpaid royalties corresponding to the Severed Coal.  MMS is an agency of the United States Department of the Interior. (App. 667-68 and 672, 08/06/10 Am. Findings of Fact and Conclusions of Law; App. 847-51, 10/06/09 MMS Letter.)

46.     As the holder of the mining permits, the Debtor was responsible for potential reclamation liability incurred when the Severed Coal was mined. (App. 822, 2011 Norwest Report.)

*Procedural History Regarding the Severed Coal*

47.     On August 31, 2009, the Trustee commenced Adversary Proceeding 09-02375 in which he sought, among other things, to recover the Severed Coal or its value from

Standard, Hiawatha, COP, and from Intermountain Power Agency ("**IPA**"), Commonwealth Coal Services, Inc. ("**Commonwealth**"), Nevada Power Company ("**Nevada Power**") and Tennessee Valley Authority ("**TVA**"), as buyers of the Severed Coal (collectively, the "**Coal Purchasers**" or "**Coal Buyers**"). (App. 200, AP 09-2375 Complaint.)

48.     On September 29, 2009, the Coal Purchasers filed a Joint Motion to Dismiss the Trustee's Complaint as against them in AP 09-2375, in which they relied on *Benton v. State of Utah,* 709 P.2d 362 (Utah 1985), for the proposition that the Severed Coal was not property of the estate (the "**Motion to Dismiss**"). (App. 234-37, AP 09-2375 Motion to Dismiss.)

49.     On November 9, 2010, the bankruptcy court held a hearing on the Motion to Dismiss and denied the motion, determining that the Trustee's claim to recover the Severed Coal was "plausible on its face" notwithstanding *Benton*. (App. 374-76, 12/28/09 Order.)

50.     The Coal Purchasers then sought leave to file an interlocutory appeal regarding the bankruptcy court's denial of their Motion to Dismiss. (App. 258-334, AP 09-2375 Motion for Leave to Appeal.)

51.     On February 16, 2010, this Court, Judge Dale A. Kimball, entered a *Memorandum Decision and Order Denying Leave to File Interlocutory Appeal*. (App. 755-67, District Court Mem. Decision.) Judge Kimball found, "Movants [the Coal Purchasers] improperly try to broaden the holding of *Benton* to include <u>factual situations</u> and <u>legal issues</u> that it did not address or contemplate." (App. 764, District Court Mem. Decision (emphasis added).)

## SUMMARY OF ARGUMENT

The issue in this appeal is whether the Severed Coal was "property of the estate" under the Bankruptcy Code.  The Severed Coal comprises approximately 1,019,000 tons of coal substantially prepared for removal from the Mine by the Debtor at significant cost, both pre- and post-petition, and taken from the Mine by Hiawatha in violation of the automatic stay when Hiawatha took possession from the Debtor in July 2008.  Because the Severed Coal was, and is, property of the estate as proceeds of the Debtor's exclusive rights to the coal in the Mine as of the date of the petition, the bankruptcy court erred in denying the Trustee's Motion for Summary Judgment and granting the Coal Purchasers' Motions for Summary Judgment.

Determining whether a particular interest is property of the estate has two aspects.  First, courts look to state law to determine if an interest exists.  Once that determination is made, courts look to federal law to determine if the interest is property of the estate within the meaning of the Bankruptcy Code.  If state law conflicts or is inconsistent with an important federal interest, federal bankruptcy law controls.  Under § 541(a), property of the estate is a very broad concept that includes "every conceivable interest of the Debtor" as of the date of the bankruptcy petition – *i.e.*, all legal and equitable, possessory and non-possessory, novel, contingent, speculative, and derivative interests.  No asset of any value is excluded.  Property of the estate also includes "proceeds," "product" and "profit" derived from any property of the estate.  The terms "proceeds," "product" and "profit" are equally broad and cover anything of value derived in any way from property of the estate.

Here, Utah law recognizes that the Debtor had an interest in the leased premises, including the Mine, as of the petition date.  Specifically, Utah law provides that a lease

which conveys "exclusive possession" of a leased premises conveys a "leasehold interest" in the real property.  Since, as the bankruptcy court found previously, the 1997 Operating Agreement granted the Debtor the "exclusive rights … to possession of the premises and to mine and remove coal from the mine premises," it granted to the Debtor an immediate leasehold interest in the minerals on the premises in their natural state.  The Severed Coal was proceeds, product or profits of the coal *in situ* because it was clearly derived from such coal.

In the 8001 Order, the bankruptcy court rejected this argument and held that under *Benton v. State of Utah*, 709 P.2d 362 (Utah 1985), the 1997 Operating Agreement granted not a leasehold interest but a "profit-à-prendre" interest.  The bankruptcy court went on to hold that this interest was not an interest of the estate in property because it did not convey "title to the coal *in situ*" but granted only a contingent right to title (an "incorporeal hereditament") to the Severed Coal if the Debtor actually severed it in the future.  Finally, the bankruptcy court concluded that Hiawatha, not the Debtor, severed the Severed Coal, so the Debtor never obtained title to the Severed Coal; hence, neither the coal *in situ* nor the Severed Coal was ever property of the estate.

The bankruptcy court's interpretation and application of *Benton* is incorrect for several reasons.  First, *Benton* is a conversion case, not a property-of-the-estate case considering § 541(a), concluding that the lease in question did not convey a sufficient interest to sustain a conversion claim.  Second, unlike the lease in *Benton*, the 1997 Operating Agreement conveyed to the Debtor a possessory, leasehold interest in the Mine.  Third, even if the 1997 Operating Agreement were interpreted to convey only a "profit-à-prendre" interest, as the bankruptcy court held, that interest – the exclusive right to possess the Mine and all the coal in the Mine, and to remove and sell that coal for a profit – is an

interest of the Debtor recognized by § 541(a).  Even under *Benton* and the cases cited therein, that interest is a "property right" in the coal *in situ* and a contingent interest in the Severed Coal.  The bankruptcy court's conclusion that the Debtor must hold "title" to the coal to have an interest therein was clear error.  The 8001 Order is also substantially inconsistent with prior rulings of the bankruptcy court in this case.  In December 2009, in connection with the Trustee's efforts to regain possession of the Mine, the court ruled:

> The Debtor's exclusive rights under the 1997 Operating Agreement to possession of the mine premises and to mine and remove coal from the mine premises were property of the estate. …
>
> …
>
> Since July 1, 2008, Hiawatha, acting in concert with COP and Standard, has willfully violated the automatic stay by, among other things: (a) refusing to deliver possession of the mine to Debtor or the Trustee; (b) mining and removing approximately 1,019,347 tons of coal from the mine; and (c) purporting to sell and in fact delivering most of that coal to third parties.

It is difficult, if not impossible, to reconcile the court's ruling that COP and Hiawatha "exercise[d] control over property of the estate" in violation of the automatic stay by removing the Severed Coal and selling it to the Coal Purchasers with the Order's ruling that the coal *in situ* and the Severed Coal were never property of the estate.  Moreover, the Utah Supreme Court has also expressly recognized that all contract rights of a debtor owned as of the date of the petition become property of the estate under § 541(a), and it defers to federal cases so holding.  Accordingly, the Severed Coal was proceeds, product or profit generated from the Debtor's exclusive rights to mine and sell that coal regardless of who extracted it.

The Severed Coal was also proceeds of other valuable interests and assets of the Debtor as of the petition date.  As the bankruptcy court previously found, "[i]t cannot be disputed that one of the most valuable assets of a mine operator is a permit to operate the mine."  All the coal taken from the Mine, including the Severed Coal, was mined under the

authority of the Debtor's DOGM Permit and the Reclamation Bond upon which the DOGM Permit was based.  Additionally, the Severed Coal was proceeds of the Debtor's equitable interest in the Second Longwall Panel, which became the Severed Coal.  It took the Debtor seven years, expending between $14 and $16 million, to prepare the coal in the Second Longwall Panel for removal.  Those substantial efforts and expenditures gave the Debtor a valuable equitable interest in that coal, which Hiawatha took from the estate when it performed the last work to remove the coal from the Mine and sell it to the Coal Purchasers in violation of the stay.  The value of the coal that Hiawatha mined and sold in violation of the stay was approximately $63 million.  Finally, the estate has an equitable interest in the Severed Coal because it has borne the burdens of ownership of such coal.  The estate has been ordered to hold funds in escrow from the sale of the Mine to pay the Department of Interior for underpaid royalties corresponding to the Severed Coal.

The 8001 Order is also wrong for failure to follow bankruptcy law because all COP's and Hiawatha's actions in possessing the Mine and removing and selling the Severed Coal were "void and without effect."  Federal law, not state law, governs any post-petition disposition of estate property.  It is well settled in the Tenth Circuit that all actions in violation of the stay are void and without adverse legal effect to the estate.  Here, the 8001 Order erroneously relies on *Benton* to conclude that Hiawatha "severed" the Severed Coal, and the Debtor did not, thereby precluding the Debtor from gaining any interest therein.  All Hiawatha's actions, however, in possessing the coal *in situ* and removing the Severed Coal were void and without adverse legal consequence to the estate.  Hiawatha "severed" nothing and cut off none of the estate's rights.  Hiawatha's

purported sales of the Severed Coal to the Coal Purchasers were equally without legal effect.  Finally, the 8001 Order errs because significant federal interests preclude any reliance on *Benton* to cut off the estate's rights in the coal *in situ* and the Severed Coal, these interests include the broad sweep of § 541(a) to reach any asset of value and the protections of the automatic stay to ensure equal distribution to all creditors.

This Court should reverse the bankruptcy court's 8001 Order and remand with instructions to enter judgment granting the Trustee's Motion for Summary Judgment, denying the Defendants' Motions for Summary Judgment and declaring that the Severed Coal was property of the estate at the time it was sold to the Coal Buyers by Hiawatha.

<u>ARGUMENT</u>

**I.     The Controlling Law Regarding "Property of the Estate" Under § 541(a) of the Bankruptcy Code.**

**a.     Under § 541(a), "Property of the Estate" Is a Very Broad Concept That Includes Every Conceivable Interest of the Debtor Recognized by State Law As of the Date of the Petition.**

The commencement of a bankruptcy case creates an estate that can be liquidated or organized to satisfy the claims of creditors.   Under § 541(a)(1), property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."   But the Bankruptcy Code does not define an "interest of the debtor in property." Courts resolve this issue by looking initially to state law to determine if an interest exists and then to federal law to determine whether that interest falls within the scope of the Bankruptcy Code.   In *Parks v. FIA Card Services, N.A. (In re Marshall)*, 550 F.3d 1251 (10th Cir. 2008), the court stated, "[f]or purposes of most bankruptcy proceedings, property interests are

created and defined by state law.  Once that determination is made, however, we must still look to federal bankruptcy law to resolve the extent to which that interest is property of the estate." *Id.* at 1255 (quoting *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir. 2002)); *see also In re Ford*, 574 F.3d 1279, 1283 (10th Cir. 2009) ("[p]roperty interests referred to in the Bankruptcy Code are generally defined by state law"); *Butner v. United States*, 440 U.S. 48, 54-55 (1979) (noting that "[p]roperty interests are created and defined by state law).   The state-law determination will generally control "[u]nless some federal interest requires a different result."   *Butner*, 440 U.S. at 55. Additionally, "[t]he label … that state law affixes to a particular interest in certain contexts is not always dispositive.   The principal question is whether the substance of the right or interest in question brings it within the scope of estate property under the Bankruptcy Act." *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1991).

With regard to the scope of § 541(a), numerous authorities have emphasized that its language is broad and intended to encompass all property interests of whatever nature that exist as of the date the case is filed.  The Supreme Court has held, "[a]lthough [§ 541(a)(1) could be read to limit the estate to those 'interests of the debtor in property' at the time of the filing of the petition, [the Supreme Court] view[s] [§ 541(a)(1)] as a definition of what is included in the estate, rather than as a limitation."   *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).  More specifically, "[w]ell established Tenth Circuit precedent directs that 'the scope of section 541 is broad and should be generously construed.'"   *Jubber v. Ruiz (In re Ruiz)*, 455 B.R. 745, 749 (10th Cir. B.A.P. 2011) (quoting *Williamson v. Jones (In re Montgomery)*, 224 F.3d 1193, 1194 (10th Cir. 2000) ("[w]e have pointed out that the scope of § 541 is broad and should be generously construed, and that an interest may be property of

the estate even if it is 'novel or contingent'")); s*ee also In re Dittmar*, 618 F.3d 1199, 1207-

10 (10th Cir. 2010) (holding that stock options, the vesting of which was contingent on terms

not within a debtor's control, were property of the estate under § 541).  As the Tenth Circuit

emphasized in *Dittmar*, "[e]very conceivable interest of the debtor, future, nonpossessory,

contingent, speculative, and derivative, is within the reach of 11 U.S.C. § 541." *Dittmar*, 618

F.3d at 1207 (quoting *In re Yonikus,* 996 F.2d 866, 869 (7th Cir. 1993) (internal quotations

omitted)).[6]  With regard to contingent interests, *Dittmar* further clarifies that such interests

need only be "rooted in the pre-bankruptcy past." *Dittmar*, 618 F.3d at 1208.

　　　As set forth in Section II below, Utah law, not surprisingly, recognizes that a lessee of

mineral rights has a property interest in the minerals to be mined.  That interest, whatever

specific label Utah law may apply, is property of the estate covered by § 541(a).

**b.**　　**Under § 541(a)(6), Property of the Estate Also Includes, Post-Petition, All "Proceeds," "Product" and "Profits" of Property of the Estate – Concepts Which Are Similarly Broad Covering Anything of Value Derived or Generated From Property of the Estate.**

　　　Under § 541(a)(6), property of the estate also includes all "[p]roceeds, product … or

profits of or from property of the estate."   In *United States v. Messner*, 107 F.3d 1448 (10th

Cir. 1997), the Tenth Circuit explained this principle: "[t]he reach of § 541(a)(6) … attaches

to any after-acquired property of the estate and makes that property subject to bankruptcy

jurisdiction.  Although, in general, property not owned by [an individual] debtor [as opposed

---

　　　[6] *See also United States v. Rauer*, 963 F.2d 1332, 1337 (10th Cir. 1992) (quoting *United States v. Cardall*, 885 F.2d 656, 678 (10th Cir. 1989), for the position that § 541 is broadly construed "to include all property interests, whether reachable by state-law creditors or not, and whether vested or contingent"); *Olah v. Baird (In re Baird)*, 567 F.3d 1207, 1208 (10th Cir. 2009) (doctor/debtor's "right to consent to settlement under his medical liability insurance policy" was property of the estate).

to a corporate debtor] until after the filing of a bankruptcy petition is not includable in the bankruptcy estate, an exception exists for after-acquired property comprised of the proceeds of estate property." *Id.* at 1452-53 (holding that money "derived from tangible or intangible assets" held by the debtor as of the petition was a "proceed" of such assets); *see also In re Calder,* 973 F.2d 862, 866 (10th Cir. 1992) (property of "[t]he estate does not … remain static.   It also includes any interest in property that the estate acquires after the commencement of the case"); *Wheeler v. Milbank (In re Wheeler),* 431 B.R. 158, 161-62 (N.D. Tex. 2005) (accounts receivable derived from the use of a state-issued permit to engage in a regulated business are included in a debtor's estate); *In re Barnes,* 276 F.3d 927, 928 (7th Cir. 2002) (proceeds from the sale of property of the estate (a liquor license) are also property of the estate); *United Virginia Bank v. Slab Fork Coal Co.,* 784 F.2d 1188, 1191 (4th Cir. 1986) (funds paid by a coal purchaser post-petition for coal mined pursuant to a debtor's pre-petition contract were proceeds of the contract and property of the estate).

Consistent with the broad reading required of 541(a)(1), Congress also intended that § 541(a)(6) be interpreted broadly:

> Like the general estate definition of Section 541(a)(1), the scope of the "proceeds, product, offspring, rents, or profits" clause in Section 541(a)(6) is quite broad, not limited to the definition of "proceeds" set forth in the Uniform Commercial Code, but encompassing any conversion in the form of property of the estate, and anything of value generated by property of the estate.  S. Rep. No. 989, 95th Cong. 2d Sess. 82 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 368 (1977) 1978 U.S.Code Cong. & Admin.News 5787; *Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512, 515 (2d Cir.1985) (insurance payments for repairs on automobile that was part of estate); *In re Calder*, 94 B.R. 200, 201 (Bankr.D.Utah 1988), *aff'd*, 912 F.2d 454 (10th Cir.1990) (attorneys' fees for prepetition services).

*In re Taronji*, 174 B.R. 964, 969 (Bankr. N.D. Ill. 1994) ("proceeds" includes interests "resulting from" property of the estate).  In sum, "proceeds," "product" and "profits" are

broad terms that encompass any conversion in the form of property of the estate and anything of value derived, generated or resulting from assets of the estate.

**II.** **Under Utah Law, As of the Petition Date, the Debtor Had An Interest In the Coal *In Situ* and a Contingent and Equitable Interest In the Severed Coal, and It Had Numerous Other Interests From Which the Severed Coal Was Also Derived.**

   **a.** **The 1997 Operating Agreement Was Property of the Estate and Gave the Debtor an Interest In the Coal *In Situ*. The Severed Coal Was Proceeds, Product or Profits of That Interest.**

As of the petition date, the property of the estate included the 1997 Operating Agreement which gave the Debtor exclusive rights to possess the Mine and to mine, remove and sell coal from the Mine. The bankruptcy court has determined several times in this case that the Debtor's mineral rights under the 1997 Operating Agreement were property of the estate at all times since the petition date until they were sold with court approval to Rhino Energy. In its December 9, 2009 order, the court stated:

> 30. The Debtor's exclusive rights under the 1997 Operating Agreement to possession of the mine premises and to mine and remove coal from the mine premises were property of the estate. As such, COP's act of entering into the Hiawatha Operating Agreement and thereby purporting to transfer those same rights to Hiawatha violated the automatic stay under § 362(a)(3) as an act "to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate" and is therefore void.

(App. 246-47, 12/09/09 Findings of Fact and Conclusions of Law (emphasis added).) The Order here appealed also acknowledged these rights: "[t]he 1997 Operating Agreement gave the Debtor the exclusive right to mine coal on the [Leased Premises] for the term of 25 years, beginning March 1, 1997, and extending to February 28, 2022." (App. 1113, 8001 Order).

Depending on the language used, an agreement granting mineral rights may create either a leasehold interest (*i.e.*, "title") or a "profit-à-prendre." A true lease "conveys an

interest in land and transfers possession." *Keller v. Southwood North Medical Pavilion, Inc.*, 959 P.2d 102, 107 (Utah 1998) (quoting 49 Am.Jur.2d *Landlord and Tenant* § 21(1995)).   It "convey[s] a definite space and … transfer[s] exclusive possession of that space to the lessee," and it allows the grantee to exclude the grantor from the land. *Id.* (distinguishing between a "leasehold interest" in real property and a "license in real property").   A profit-à-prendre, by contrast, grants the "'right to make some use of the soil of another, such as the right to mine metals, and it carries with it the right of entry and the right to remove and take from the land the designated products or profit and also includes the right to use such of the surface as is necessary and convenient for exercise of the profit.'"   *Bonds v. Carter,* 75 S.W.3d 192, 197 (Ark. 2002) (quoting *Black's Law Dictionary* 1483 (6th ed. 1990)).[7]

In the 8001 Order, the bankruptcy court recognized the difference between a profit-à-prendre and a true lease and determined that under *Benton v. State of Utah*, 709 P.2d 362 (Utah 1985), the 1997 Operating Agreement gave the Debtor a profit-à-prendre.   Citing *Benton*, the court noted that a profit-à-prendre does not transfer the land but gives the holder "'an incorporeal hereditament, a right to quarry and take the stone from the area involved. This stone [becomes] the property of [the lessees] only upon its actual severance.   There can be no property in rock, and the title thereto cannot be divested or acquired until it has been

---

[7] *See also Sproul v. Gilbert*, 359 P.2d 543, 553-556 (Or. 1961) (discussing the difference between leases, licenses, and profit-à prendres and holding that a lease was created where the grantee received exclusive possession of the land and could generally exclude the grantor from the property); *United States v. Atomic Fuel Coal Co.*, 383 F.2d 1, 5 (4th Cir. 1967) (finding that agreement created a lease and gave the lessee an immediate interest in minerals in their natural state); *Holt v. City of Montgomery*, 102 So. 49, 51 (Ala. 1924) ("[o]ne of the principal tests in determining whether or not the contract is to be interpreted as a lease … is whether or not it gives exclusive possession of the premises against all the world, including the owner").

taken from the earth.'"  (App. 1115-16, 8001 Order (quoting *Benton*, 709 P.2d at 366).)

Based on this conclusion, the court held:

> … The Court concludes as a matter of law that the Severed Coal, and the Severed Coal proceeds, were never property of the estate.
>
> . . .
>
> As set forth in *Benton*, a profit à prendre gives no title to minerals in the ground and no title to minerals severed by others.  <u>The 1997 Operating Agreement granted the Debtor no title to coal in situ, and granted the Debtor title to coal only that the Debtor itself actually severed.</u>  It is undisputed that the Debtor did not sever the Severed Coal.  The Estate, as a matter of law and undisputed fact, does not have title to the Severed Coal or the Severed Coal Proceeds, and never had such title.

(App. 1115-16, 8001 Order).  Clearly assuming "title" to coal to be the only type of property interest covered by § 541(a), the bankruptcy court concluded that the Debtor never had an interest in the coal *in situ* and never obtained any interest in the Severed Coal because the Debtor did not "sever" it.

As set forth below, the court's application of *Benton* is flawed because the 1997 Operating Agreement did grant the Debtor a leasehold interest in the coal *in situ* and not merely a profit-à-prendre.  (*See* Section II.a.i., *infra.*)  But, more importantly, even if the bankruptcy court were correct that *Benton* limits the Debtor's rights to those granted by a profit-a-pendre, Utah law recognizes that interest.  Specifically, *Benton* itself acknowledges that a profit-à-prendre grants the lessee exclusive contractual rights to mine and remove the minerals in the ground, and also grants a contingent interest (an "incorporeal hereditament") to obtain title to the minerals upon severance.  Moreover, the Utah Supreme Court, consistent with innumerable federal cases, has specifically held that "contract rights" fall within the broad sweep of § 541(a) as property of the estate.  (*See* Section II.a.ii., *infra.*)  Put differently, even if the Debtor's rights under the 1997 Operating Agreement did not equate to

"title," it does not follow that the Debtor did not have significant equitable and contingent interests in the coal *in situ,* which became the Severed Coal.  Those interests were of substantial value to the estate and fall squarely within the broad scope of § 541(a)(1).  Moreover, the Severed Coal was the very "product" and "profit" the Debtor was entitled to take by exercising its exclusive profit-à-prendre rights as contemplated by § 541(a)(6).  Accordingly the coal *in situ* was "property of the estate" as of the petition date (even if the estate did not have title), and the Severed Coal was "proceeds, product or profits" of the Debtor's interest in that coal.

### i.     The 1997 Operating Agreement Granted the Debtor a Possessory Interest to the Coal *In Situ*.

The 1997 Operating Agreement granted the Debtor exclusive possession of all of the described land, not just the limited right to use the land for coal-mining purposes, though it granted that right too:

> Owner, in consideration of the royalties to be paid and conditions to be observed as hereafter set forth, <u>does hereby grant unto Operator the exclusive authority to operate and control the following described tracts of land</u> … for the term of 25 years, beginning March 1, 1997, and extending to February 28, 2022.

> Operator shall have the <u>exclusive right to, and use of the described property for purposes reasonably incident to the mining and removal of coal</u>, including any existing underground workings or facilities heretofore placed in or upon the leased area.  Operator shall also have the unrestricted use of all access roads leading to the described property.

(App. 897, 1997 Operating Agreement (emphasis added).)  "Possession" is "the right under which one may exercise control over something to the exclusion of all others," and "exclusive possession" is "[t]he exercise of exclusive dominion over property, including the use and benefit of the property."  *Black's Law Dictionary* 949 (7th ed. 1999).  By granting

the Debtor the "exclusive authority to operate and control" all of the leased property, without expressly limiting that use to coal-mining purposes, the 1997 Operating Agreement gave the Debtor exclusive possession of the property.

Additionally, the Lease did not reserve for COP the right to possess or use the "leased area" during its 25-year term.  In fact, the only rights of entry reserved for COP were limited, at reasonable times, to: (1) ensure that the premises were being "maintained, protected, and used in accordance with the terms of [the] agreement;" (2) check the tonnage of coal which may be mined and extracted by [Debtor]"; and (3) periodically conduct a "survey of the mine or mines of the Operator … for the purpose of checking the statements made by [Debtor] of the coal removed … and of the amounts paid as royalties … and for the purpose of determining the manner in which the mining upon the premises has been or is being performed." (App. 897-99, 1997 Operating Agreement.) Reservation to COP of these limited rights of entry would have been unnecessary had the 1997 Operating Agreement not given the Debtor exclusive possession of the leased property.

> ii.      **Alternatively, Under *Benton* the 1997 Operating Agreement Granted the Debtor an Interest In the Coal *In Situ* and a Contingent Interest In the Severed Coal.**

Because the 8001 Order relies heavily on *Benton,* a detailed analysis of *Benton* is necessary.  Properly understood, *Benton* affirms that the Debtor had an interest in the coal *in situ* and a contingent interest in the Severed Coal.

In *Benton*, United Development had a mineral lease from the State of Utah granting United "the exclusive right and privilege to mine, remove, and dispose of all … Building Stone, in, upon, or under the … tract of land … together with the right to use and occupy so much of the surface of said land as may be required for all purposes reasonably incident to

mining, removal, and disposal of Building Stone." 709 P.2d at 366. During United's lease term, Portland Cement, under another lease with the State covering the same land, removed limestone from the property without United's consent. United sued Portland for conversion to recover the value of the limestone removed. The trial court denied the claim, stating "[a]ny claim against Portland … for removal of limestone from the leased premises is a claim by the [State] and not a claim by [United] because [it] in no way was denied occupancy, use, or in any way interfered with by Portland," adding that United "never even attempted to go into possession of the leased premises during the term of the lease." *Id.* at 365.

The Utah Supreme Court affirmed. The court first noted that to establish conversion United must prove that it had possession of the limestone at issue. "Essential to the doctrine of conversion is that the plaintiff have title or possession of the item allegedly converted." *Id.* The court further noted that "'an action for conversion is not maintainable unless the plaintiff, at the time of the alleged conversion, is entitled to immediate possession of the property. An interest in the property which does not carry with it a right to possession is not sufficient; *the right to maintain the action may not be based upon a right to possession at a future time*.'" *Id.* (emphasis in original) (quoting *Johnson v. Flowers*, 228 P.2d 406, 407 (Utah 1951). Next, the court analyzed the lease concluding that it gave United only the "right to possession of the stone at a future time – namely at the time United Development severed the coal from the land." *Id.* at 366. The court further noted (and this is language the bankruptcy court misconstrued) that equivalent lease provisions have been interpreted to "not transfer the land, but [to give the lessees] an incorporeal hereditament, a right to quarry and take stone from the area involved. This stone [becomes] the property of [the lessees] only

upon its actual severance. There can be no property in rock, and the title thereto cannot be divested or acquired until it has been taken from the earth." *Id*. citing *Jones Cut Stone Co. v. New York,* 166 N.Y.S.2d 742, 746 (1957). Ultimately, *Benton* concluded that United did not have possessory rights in the stone sufficient to maintain a conversion claim.

Two critical points must be taken from *Benton*. First, *Benton* is a conversion case focusing on "title" and "immediate possession," not a bankruptcy case applying § 541 where future rights are expressly included and protected. It stands for the proposition that where a mineral lease grants the right to mine but does not convey title, and the lessee never takes possession of the property or mines the stone, the lessee does not have a sufficient possessory interest to maintain a conversion claim. Here, the Trustee does not assert conversion, he seeks a determination that the Debtor had an interest in the coal *in situ* and that the resulting Severed Coal was proceeds of that interest under § 541. His claims are for turnover of the property or its value under § 542 or, alternatively, to avoid the unauthorized post-petition transfers of the property (removing and selling the coal) under § 549 and recover its value under § 550. The Trustee's claims are very different from conversion. Unlike a conversion claim, the Trustee's claims require only that he show some interest in property under § 541(a) rather than title or immediate possession. As to the Trustee's burden, "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of 11 U.S.C. § 541." *In re Dittmar, supra,* 618 F.3d at 1207.

Second, *Benton* acknowledges that even a mineral lease that does not convey title or immediate possession still grants significant rights – the exclusive right to mine, remove and dispose of the stone in the ground and a contingent right to possession upon severance at a future time, or in *Benton*'s words, "an incorporeal hereditament, a right to quarry and take

36

stone from the area involved."   709 P.2d at 366.   Though these interests may not be "sufficient" to maintain a conversion action – "[a]n interest in the property which does not carry with it a right to possession is not sufficient; the right to maintain the [conversion] action may not be based upon a right to possession at a future time" –*Benton* nonetheless recognizes they are an "interest in [ ] property."   Moreover, the very case that *Benton* relied on for its "incorporeal hereditament" language held: "[t]his right, easement or incorporeal hereditament *is a property right* for which claimant is entitled to compensation" because the right was infringed.  *Jones Cut Stone*, 166 N.Y.S.2d at 747 (emphasis added).

In sum, *Benton* dictates that under the 1997 Operating Agreement the Debtor had immediate interests in the coal *in situ* and a contingent interest in the Severed Coal, regardless of who "severed" it.   Moreover, *Benton* is not inconsistent with the Trustee's argument that the Debtor had an equitable interest in the Severed Coal because, unlike United Development, the Debtor took possession of the Mine and expended considerable efforts to mine the Severed Coal and prepare it for removal.   Additionally, with regard to the Severed Coal which Hiawatha removed, the Debtor entered into the PSA with Hiawatha that continued to recognize the Debtor as the operator and permittee while Hiawatha was in possession.

Finally, the Utah Supreme Court has also made clear that it understands and agrees with the broad scope of § 541(a) and defers to bankruptcy law that contract rights become property of the estate upon the filing of a petition:

> We are of the view that any contract rights held by the [debtors] under the original loan agreements became property of the estate when they filed for bankruptcy ….   This view is supported by section 541(a) of the Bankruptcy Code, which defines "property of the estate" as all legal and equitable interests of the party filing bankruptcy. …   This provision has been interpreted as "all-

inclusive" and "sweeping" ….   Consistent with this broad definition of "property of the estate," courts generally have held it to include whatever contract rights the debtor holds when the bankruptcy petition is filed.

*First Security Bank of Utah v. Creech*, 858 P.2d 958, 963-64 (Utah 1993) (citations omitted).[8]

      **b.**    **The Severed Coal Was Also Property of the Estate As Proceeds of the DOGM Permit, the Reclamation Bond, the BLM R2P2, and the Debtor's Equitable Interest Created by Its Expenditures In Preparing the Second Longwall Panel for Extraction.**

As of the petition date, and when Hiawatha took over the Mine, the property of the estate also included the DOGM Permit, the Reclamation Bond, the BLM R2P2, and the interest the Debtor had created by preparing the Second Longwall Panel for extraction.  The Severed Coal was "derived from" or "generated by" these assets and, therefore, was proceeds of property of the Estate.

---

[8] *Slab Fork Coal Co., supra,* is also particularly applicable here.  The Fourth Circuit held that proceeds of a supply contract between a coal producer (Slab Fork) and a coal purchaser (Armco) included proceeds generated post-petition when a third-party (Maben) provided coal to Armco in Slab Fork's place. The court reasoned that Maben provided the coal to Armco pursuant to the Slab Fork-Armco contract and, consequently, payment for the Maben-provided coal was a "proceed" of that contract. 784 F.2d at 1190. Though *Slab Fork* arose under § 552(b) instead of § 541, § 552 explicitly refers to "proceeds" of pre-petition property.  *Slab Fork* required analysis of the same question at issue here: the extent to which work done by another can become the proceeds of a contract which is estate property. The estate property was the pre-petition contract between Slab Fork and Armco giving Slab Fork an "intangible," contingent right to payment.  *Id.* at 1190-91. The court held that the post-petition payments Slab Fork received pursuant to that contract, even for Maben's "work," were proceeds of the Slab Fork's pre-petition contract.  *Id.*  Just as in *Slab Fork*, where post-petition payments for coal were "proceeds" of a pre-petition contract even though Maben, rather than Slab Fork, actually provided the coal – the Severed Coal is a proceed of the Debtor's pre-petition contractual right to extract coal even though Hiawatha, rather than the Debtor, actually removed the coal. Because the Severed Coal is a "proceed" of the debtor's pre-petition contract, it is property of this estate under § 541(a)(6).

First, the Severed Coal was proceeds of the DOGM Permit and Reclamation Bond. Although the PSA contemplated that the Debtor would sell the DOGM Permit to Hiawatha, such transfer was contingent on necessary governmental approvals which were never obtained.  By August 8, 2008, when the bankruptcy court entered the Preservation Order, Hiawatha had failed to transfer the DOGM Permit into its name, and the Order expressly forbade the Debtor from transferring the Permit absent further court order.  Subsequently, the court refused to grant Hiawatha's Motion for Relief from Stay to allow Hiawatha to transfer the Permit and Bond into its name. (App. 72-75, 03/18/09 Memorandum Decision.)  Thus, Hiawatha never obtained the DOGM Permit or Bond.  Accordingly, the Severed Coal was mined under the authority of the DOGM Permit and Reclamation Bond, which were property of the estate, and was proceeds of the same.

Second, the Severed Coal should be considered property of the estate as a result of the PSA. The PSA provided: "[Debtor] agrees to maintain all permits and continue as operator and permittee, until such time as [Hiawatha] obtains any and all required approvals." (App. 859-60, PSA.) As explained above, Hiawatha never obtained the necessary approval to transfer the mining permits into its name.  Accordingly, under the terms of the PSA, the Debtor remained the operator and permittee when the Severed Coal was mined and sold. Thus, the Debtor should be deemed to be the entity that severed the coal from the Mine such that the Severed Coal is property of the estate even if the bankruptcy court's interpretation of *Benton* (*i.e.,* that a mineral lessee does not obtain title to minerals until severance thereof and that title is the only interest recognized as property of the estate by § 541) were correct.

Third, the Severed Coal was proceeds of the Debtor's equitable interest in the Second Longwall Panel created by the Debtor's efforts, both prepetition and post-petition, to prepare

that coal for removal.  Equitable interests are property of the estate under § 541(a).  As evident from the recitals to the Advance Purchase Agreement ("**APA**"), the Debtor's efforts to create the Second Longwall Panel began in 2001. (App. 769-72, APA.)  The Debtor expended between $14 million and $16 million in preparing the Second Longwall Panel, which was only two months away from extraction when Hiawatha took possession of the Mine. (App. 818-19, 2011 Norwest Report.) These efforts, both pre-bankruptcy and during the gap period, gave the Debtor an equitable interest in the Second Longwall Panel both on the Petition Date and when the Debtor was evicted.

> ### c.   The Severed Coal Is Property of the Estate Because the Debtor Is At Least the Equitable Owner of the Severed Coal Because It Has Borne the Burdens of Ownership, Including the Obligation to Pay Royalties.

Additionally, the Severed Coal is property of the estate because the estate has borne the burdens of ownership of the Severed Coal, which gives the Debtor an equitable interest in the Severed Coal.  *See, e.g., In re KAR Dev. Assocs.*, 180 B.R. 597, 611 (Bankr. D. Kan. 1994) (lessee that bears the burdens of ownership is "at least the equitable owner of the property").  For example, this estate has been ordered to hold funds in escrow to pay MMS for underpaid royalties corresponding to the Severed Coal. (App. 672, 08/09/10 Am. Findings of Fact and Conclusions of Law.) Also, as the holder of the mining permits, the Debtor was responsible for potential reclamation liability incurred when the Severed Coal was mined. (App. 882, 2011 Norwest Report.)  Another burden borne by the Debtor is exposure to liability for tort or worker's compensation claims arising from Hiawatha's mining operations. This exposure results from the terms of the PSA, which expressly provide that the Debtor was the operator of the mine. (App. 859-60, PSA.)  The Debtor has also

borne the burden of ownership with respect to the Severed Coal because the Debtor, rather than Standard, COP or Hiawatha, was the party bound to produce coal under the contracts pursuant to which the Severed Coal was sold to the Coal Purchasers.  Because this estate has borne the burdens of ownership of the Severed Coal, it is the equitable owner of the same.

**III.    The Bankruptcy Court Erred When It Relied on *Benton* to Cut Off the Debtor's Interest In the Severed Coal and Did Not Follow Federal Law to Determine That the Severed Coal Was Property of the Estate.**

**a.    The Automatic Stay of § 362(a) Protects All Property of the Estate and Renders All Unauthorized Actions to Exercise Control Over Such Property "Void and Without Effect."**

While state law is considered in determining what is property of the estate as of the date of the petition, once the interest is identified, federal bankruptcy law controls thereafter to protect such property.  As set forth above, the Debtor had an exclusive interest in the coal *in situ* as of the petition date and it had a contingent and equitable interest in what became the Severed Coal as a result of its pre- and post-petition efforts to prepare the coal for removal before Hiawatha took possession.   All these interests were protected by the automatic stay provisions of § 362:

> (a)  Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title … operates as a stay, applicable to all entities, of –
>
> > (3)  any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; ....

By enacting the automatic stay, Congress recognized a substantial federal interest in ensuring the "orderly liquidation and distribution of the debtor's estate for the benefit of all creditors."  *See In re Owens,* 27 B.R. 946, 950 (Bankr. E.D. Mich. 1983).  "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws."  3

COLLIER ON BANKRUPTCY ¶ 362.03, n.6 (Alan N. Resnick & Henry J. Sommers eds. 16th ed.) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 54-55 (1978)).  It protects the bankruptcy estate "from the piecemeal reach of creditors."  *See Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006).  "[T]he stay provides creditors with protection by preventing the dismemberment of a debtor's assets by individual creditors levying on the property.  This promotes the bankruptcy goal of equality of distribution."  3 COLLIER ON BANKRUPTCY ¶ 362.03 (Alan N. Resnick & Henry J. Sommers eds., 16th ed.).  Notably, by its express terms, the stay is "applicable to all entities," not just creditors.  As the court stated in *In re Beery*,

> [I]t is also the trustee who is entitled to the protection of the automatic stay in order to preserve the estate intact.  That is, in a chapter 7 case, a debtor can wreak as much havoc on the estate as can a creditor ….  In consequence, there is nothing in § 362(a) which says that its provisions are limited only to creditors and in the process excepting chapter 7 debtors (or chapter 11 debtors out of possession) from the prohibitions of 362(a).
> …
>> … The court will not tolerate unauthorized acts by debtors or creditors by allowing possession of, or facilitating the exercise of control over, or permitting the dismemberment of property of the estate outside the provisions of the Code.  To do so would make a nullity of § 362 and what it attempts to accomplish as well as invite horrendous fraud upon the court.

*Gonzales v. Beery (In re Beery)*, 452 B.R. 825, 833 (Bankr. D.N.M. 2011) (citing *Yorke v. Citibank, N.A. (In re BNT Terminals, Inc.)*, 125 B.R. 963, 971 (Bankr. N.D.Ill. 1991)).

It is well-settled in the Tenth Circuit that actions taken in violation of the automatic stay are "void and without effect."  *Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372 (10th Cir. 1990) (citing *Kalb v. Feuerstein*, 308 U.S. 433, 438 (1940) (summary judgment for defendants void when it was entered by district court after defendants had filed chapter 11 petition)); *see also Goldston v. United States (In re Goldston)*, 104 F.3d 1198,

1201 (10th Cir. 1997) (IRS assessment in violation of stay during chapter 11 case was void in subsequent chapter 13 case; "void is void, whatever the context").   As the bankruptcy court below has acknowledged in another case, "[i]n the Tenth Circuit, actions taken in violation of the automatic stay are void ab initio, and knowledge of the stay on the part of the offending party is irrelevant.  As such, *they are without legal effect*.  From the law's point of view, they simply did not happen."  *Jubber v. Search Market Direct, Inc. (In re Paige)*, 413 B.R. 882, 915 (Bankr. D. Utah 2009) (citations omitted) (emphasis added).   Additionally, all unauthorized subsequent attempts to transfer property obtained in violation of the stay are also necessarily void.  *Id.*

> **b.     All Actions of COP and Hiawatha – Including Removing and Selling the Coal to the Coal Purchasers – Are Void and Without Adverse Effect on the Estate's Legal Rights.**

In light of § 362(a), and in addition to the other errors in the 8001 Order, the bankruptcy court's conclusion that the Severed Coal was not property of the estate is wrong because it relies on state law, exclusively *Benton*, to conclude that because Hiawatha "severed" the Severed Coal, and the Debtor did not, the Debtor had no interest in the Severed Coal.[9]  The Bankruptcy Code, not state law, controls post-petition dispositions of property of the estate and determines whether purported transfers are valid and effective in order to protect and preserve all assets for all creditors.   More specifically, with exceptions not

---

[9] The Trustee disputes the conclusion that Hiawatha severed the Severed Coal both as an issue of fact and law.  With regard to the factual issue, all justifiable inferences should have been drawn in favor of the non-movant.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Here, severing the Severed Coal was a long process – one which the Debtor started in 2001, and which Hiawatha merely finished with its last few operations after July 2008.  On these facts, the Trustee is entitled to the inference that the Debtor severed the Severed Coal.  With regard to the legal issue, see below.

applicable here, § 363 governs the disposition of property and provides that only "[t]he trustee [defined to include a Debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11. U.S.C. § 363(b)(1).  When property of the estate is transferred in violation of the Code, as here, a Trustee has two non-exclusive mechanisms to recover the property or its value.  He can obtain damages for transfers in violation of the stay under § 362 and then, under § 542(a), recover the property or its value from any party who had control of the property during the case.  *In re Ruiz*, 455 B.R. at 750 (turnover requirement under § 542(a) applies to "any entity that held the estate's property at any time during pendency of the case").  Or he can avoid the transfer under § 549(a), governing post-petition transfers, and recover the property or its value under § 550(a).

Here, prior to the 8001 Order, the bankruptcy court determined that Hiawatha and COP violated the automatic stay when COP purported to lease the Mine to Hiawatha and Hiawatha took possession and removed and sold the coal to the Coal Purchasers.   The court held, "[s]ince July 1, 2008, Hiawatha, acting in concert with COP and Standard, has willfully violated the automatic stay by, among other things: (a) refusing to deliver possession of the mine to the Debtor or the Trustee; (b) by mining and removing approximately 1,019,347 tons of coal from the mine; and (c) purporting to sell and in fact delivering most of that coal to third parties." (App. 248, 12/09/09 Findings of Fact and Conclusions of Law.) Accordingly, under § 362(a) and *Ellis*, these actions were "void and without effect."

Several conclusions inescapably flow from the foregoing. First, COP's and Hiawatha's possession of the Mine was void and without adverse effect on the Debtor's and the estate's legal rights.  None of their actions while in control of the Mine, including

Hiawatha's removal of the coal from the Mine, could in any way terminate or impair the estate's exclusive rights to the coal in the Mine.

Second, while Hiawatha, in fact, ultimately removed the coal from the Mine, it did not "sever" the coal in a legal sense, and its actions in removing the coal do not, under *Benton*, give it or any other entity "title" to, or any interest in, the Severed Coal.  More importantly, the bankruptcy court's reliance on *Benton* to conclude that the Debtor must actually "sever" the coal to gain an interest in the Severed Coal, and that since the Debtor did not "sever" the coal it had no title or interest in it, was clear error.  *Benton* does not apply to post-petition actions affecting property of the estate, and state law certainly cannot be relied on to cutoff the Debtor's interest in such property or undermine the protections of the automatic stay.  As this Court recently held in a related appeal in this very case, "the court finds the Movant's [Coal Purchasers'] reading of *Benton*'s reach to be too broad.  The *Benton* court did not attempt to redefine the parties' contractual rights or their obligations to abide by the automatic stay in place as a result of a bankruptcy.  Nor does its conclusion with respect to the type of conversion claim asserted in that case trump any legal issues that may be raised by the specific factual circumstances presented in a bankruptcy case such as the present case."  (App. 763-64, District Court Memorandum Decision.)

Third, Hiawatha's purported sales of the Severed Coal to the Coal Purchasers were equally void and without effect.  In the eyes of the law, they never happened.  They neither legally transferred any interest in the Severed Coal to the Coal Purchasers (only mere possession was transferred), nor did they terminate or impair any interest of the Debtor in the Severed Coal.  In short, the Order is wholly contrary to the protections of § 362(a) and the

prior orders of the bankruptcy court that COP's and Hiawatha's possession of the Mine and removal and selling of the coal were void and without effect.

        **c.**      **The Bankruptcy Court Erred When It Relied Exclusively on *Benton* and Failed to Consider Important Federal Interests Underlying the Automatic Stay In Protecting All Interests of the Debtor for the Benefit of All Creditors.**

Even if *Benton* could be construed to stand for the proposition that the Debtor had no interest of any sort (*i.e.,* contingent, equitable, future, etc.) in the Severed Coal, a proposition which the Trustee disputes for the reasons previously mentioned, the bankruptcy court erred in concluding that *Benton*, as opposed to federal law, controls on the issue of whether the Severed Coal is property of the estate under § 541.

As noted above, the determination of whether a particular interest is property of the estate is a two-step inquiry. *In re Marshall*, 550 F.3d at 1255 ("[f]or purposes of most bankruptcy proceedings, property interests are created and defined by state law. Once that state law determination is made, however, we must still look to federal bankruptcy law to resolve the extent to which that interest is property of the estate."). The first step considers merely whether state law recognizes that the Debtor has an interest in the property in question. The second step considers federal law in determining whether the interest is property of the estate in light of federal interests. *See* Section I.a., *supra.* If, however, state law conflicts with federal interests, state law is suspended and federal law controls. *Travelers Cas. and Surety Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 451 (2007) citing *Butner*, *supra,* 440 U.S. at 55, for the proposition that "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest

requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding"). This priority of federal bankruptcy law is mandated by Article VI, Clause 2 (the Supremacy Clause) and is consistent with Article I, Section 8, Clause 4 of the United States Constitution (which confers upon Congress the authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States").   And it finds expression in the many cases that recognize as property of the estate, under § 541, what state law would not recognize as a property interest of the debtor outside the bankruptcy context.  *See, e.g.*, *In re Barnes*, 276 F.3d 927, 928 (7th Cir. 2002) (holding that liquor license was property of the estate under the broad scope of § 541 even though it was not "property" under controlling state law); *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1991) (holding that liquor license was property of the estate because it was valuable even though it was not property under state law); *Wheeler v. Milbank (In re Wheeler)*, 431 B.R. 158, 162-63 (N.D. Tex. 2005) (proceeds from deer breeding were property of the estate even though according to state law, the debtor did not have "title" to the deer, as such were deemed property of the State of Texas).

Consideration of federal interests here militates against concluding that the Severed Coal was not property of the estate because *Benton*, as expansively interpreted by the bankruptcy court and as applied to the facts of this case, directly conflicts with several compelling federal interests. These interests include, at a minimum: (a) the purposes of the automatic stay, imposed by § 362, to protect property of the estate for equitable distribution; (b) Congressional intent in defining property of the estate broadly

to include all of a debtor's valuable interests; and (c) the role of bankruptcy courts as courts of equity.

It is axiomatic that the automatic stay operates to protect the assets of the bankruptcy estate from the attempts of individual creditors to collect on debts they are owed.  The automatic stay is part and parcel of the fundamental bankruptcy policy of equality of distribution.  If it stands, the bankruptcy court's application of *Benton* rewards the Debtor's creditors (Hiawatha, Standard and COP) for willful violations of the automatic stay because the Order implicitly confers title to the Severed Coal on either Hiawatha, COP or Standard (and ultimately on the Coal Purchasers) notwithstanding the fact that they knowingly mined and sold the coal in violation of the stay.[10]  *Benton*, as interpreted by the bankruptcy court, renders the automatic stay powerless to retain and protect valuable assets (the coal in which the Debtor had an exclusive interest and had invested millions of dollars) for the benefit of all creditors.

As previously mentioned, there are numerous cases that recognize as property of the estate, for purposes of § 541, interests which state law would not recognize as valid and executable property interests. These cases are consistent with Congressional intent to define broadly property of the estate under § 541. *See In re O'Dowd*, 233 F.3d 197, 202

---

[10]  Notably, on October 31, 2011, the Trustee moved for leave to amend his complaint in COP II to add a claim against the Coal Purchasers for violations of the stay. (*See* Dkt. No. 269 in AP 09-2375.)  The Trustee alleges that the Coal Purchasers were complicit in COP's, Hiawatha's and Standard's violations of the automatic stay.  The Trustee alleges that the Coal Purchasers knew or were willfully ignorant that the Severed Coal had been mined in violation of the stay.

(3d. Cir. 2000) ("[w]e have previously emphasized Congress' intent to delineate in broad terms what constitutes property of the estate"). *Benton*, as interpreted and applied by the bankruptcy court subverts this important federal interest. It extinguishes the Debtor's exclusive and valuable right to remove and profit from the Severed Coal.

Finally, the bankruptcy court's reliance on *Benton* is antithetical to the fundamental notion that bankruptcy courts are courts of equity. *See, e.g., Young v. Higbee Co.*, 324 U.S. 204, 214 (1945) (noting that bankruptcy courts "are courts of equity and exercise all equitable powers" except where statutorily limited). It is inequitable to allow willful violators of the automatic stay and infringers upon the Debtor's exclusive mining rights to obtain title to the Severed Coal through their wrongful acts and transfer that coal to the Coal Purchasers to the detriment of the estate's creditors. Equity requires that the bankruptcy estate benefit from the Debtor's investment of years of labor and substantial capital (between $14 million and $16 million) to prepare the Second Longwall Panel for extraction.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the bankruptcy court and remand with instructions to enter judgment granting the Trustee's Motion for Summary Judgment and denying the Defendants' Motions for Summary Judgment and declaring that the Severed Coal was property of the estate at the time it was sold to the Coal Buyers by Hiawatha.

## STATEMENT OF REASONS FOR ORAL ARGUMENT

While the facts are largely undisputed, the Trustee has requested oral argument because the facts and legal arguments are complex, and the Trustee feels that the Court would benefit from oral argument.  Moreover, the scope and application of § 541(a), defining property of the estate, go to the very heart of bankruptcy law and need to be fully explored.

DATED this 14th day of November, 2011.

/s/ Glenn R. Bronson
Michael N. Zundel mnz@princeyeates.com
Glenn R. Bronson grb@princeyeates.com
PRINCE, YEATES & GELDZAHLER
A Professional Corporation
175 East 400 South, Suite 900
Salt Lake City, Utah 84111
Telephone: (801) 524-1000
Facsimile:  (801) 524-1099
Attorneys for Appellant Chapter 7 Trustee,
Kenneth A. Rushton

<u>STATEMENT OF RELATED CASES</u>

Related cases that have been appealed or are currently on appeal include:

- *Aquila, Inc. v. C.W. Mining Co.*, 545 F.3d 1258 (10th Cir. 2008) (upholding Aquila's $24.8 million judgment against C.W. Mining).
- *A-Fab Eng'g, Inc. v. C.W. Mining Co. (In re C.W. Mining Co.)*, 431 B.R. 307 (B.A.P. 10th Cir. 2009) (holding that A-Fab was afforded sufficient due process with respect to notice of Aquila's motion to appoint trustee or convert case to a chapter 7).
- *Commonwealth Coal Services, et. al. v. Rushton (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-mc-00017-DAK (denying Coal Purchasers' motion for leave for interlocutory appeal on the issue of whether the Severed Coal is property of the estate on grounds that Coal Purchasers were reading *Benton* too broadly).
- *Standard v. Aquila, Inc. (In re C.W. Mining Co.)*, 625 F.3d 1240 (10th Cir. 2010) (affirming bankruptcy court's decision holding COP and Standard in contempt for automatic stay violations).
- *C.O.P. Coal Development, Co. v. C.W. Mining Company (In re C.W. Mining Co.)*, 641 F.3d 1235 (10th Cir. 2011) (affirming the bankruptcy court's determination that the 1997 Operating Agreement was property of the estate).
- *C.W. Mining v. Aquila, Inc. (In re C.W. Mining Co.)*, 636 F.3d 1257 (10th Cir. 2011) (holding that, subsequent to appointment of a trustee in a corporate debtor's bankruptcy, the debtor's former management does not have standing to appeal decisions on the debtor corporation's behalf).
- *C.O.P. Coal Development, Co. v. Rushton, et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00039-TS (C.O.P. appeals the bankruptcy court's imposition of sanctions against it for concealing documents in violation of discovery rules).
- *C.O.P. Coal Development, Co. v. Rushton, et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00076-TS (C.O.P. appeals the bankruptcy court's order reducing C.O.P.'s Cure Claim under the 1997 Operating Agreement, disallowing C.O.P.'s Proof of Claim No. 9 and requiring C.O.P. to pay the Trustee's attorney fees and expenses associated with objecting to the same).
- *ANR v. Rushton et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00079-TS (ANR appeals the bankruptcy court's order sustaining Trustee's objection to ANR's Proof of Claim No. 27 and the same in its entirety).
- *Hiawatha Coal Company v. Rushton et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00267-TS (Hiawatha appeals several of the bankruptcy court's orders entered in connection with the avoidance of the PSA).
- *C.O.P. Coal Development Co. v. Rushton et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00269-TS (C.O.P. appeals the bankruptcy court's order interpreting the 1997 Operating Agreement's Continuous Operations Clause, allowing the Trustee to offset royalties against C.O.P.'s cure claim and dismissing Hiawatha's counter-claim for an improver's lien).

51

- *Rushton v. Standard Industries, Inc., et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00271-TS (Standard et. al. appeal the bankruptcy court's decision avoiding security interests under § 544 and preserving them for the benefit of the estate under § 551).
- *Rushton v. Bank of Utah (In re C.W. Mining Co.)*, B.A.P. Appeal Number UT-11-98 (Trustee appeals the bankruptcy court's order granting summary judgment in favor of bank that violated automatic stay by liquidating Debtor's CD to collect on loans to Debtor).
- *Reynolds v. Rushton et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00286-TC (Charles Reynolds et. al. appeal the bankruptcy court's order authorizing the sale of mine assets and the assignment of the 1997 Operating Agreement free and clear of liens and interests). This appeal has been dismissed as moot. *See Dkt. No. 13.*
- *Standard Industries, Inc. v. Rushton et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00808-DAK (Standard appeals the bankruptcy court's order certifying, under Fed. R. Civ. P. 54(b), its order avoiding liens on UEI receivable as a final order).
- *C.O.P. Coal Development, Co. v. Rushton, et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-01217-TS (C.O.P. appeals the bankruptcy court's order imposing sanctions in the amount of $12,558.50 for C.O.P.'s discovery violations).
- *C.W. Mining Co. v. C.O.P. Coal Development Co. et. al. (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00920-TS (C.W. Mining—not the Trustee—appeals the bankruptcy court's order authorizing sale of mine assets free and clear of all liens, claims, encumbrances and interests and authorizing the assumption and assignment of the 1997 Operating Agreement).
- *Reynolds v. Rushton (In re C.W. Mining Co.)*, U.S. District Court No. 2:10-cv-00969-TS (Reynolds appeals the bankruptcy court's order granting the Trustee's motion for summary judgment that the Debtor has a lease which confers on the Debtor the exclusive right to use a particular residence).

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2011, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court using the CM/ECF system, which sent a notice of electronic filing to all parties whose names appear on the electronic mail notice list for this case.

I further certify that on the 14th day of November, 2011, I served the foregoing by transmitting a copy of the same, via U.S. Mail, to the following parties:

Gerald H. Suniville (gsuniville@vancott.com)
Van Cott, Bagley, Cornwall & McCarthy
36 South State Street, Suite 1900
Salt Lake City, UT 84111

Robert H. Scott (robert.scott@akerman.com)
Akerman Senterfitt, LLP
50 West Broadway, Suite 475
Salt Lake City, UT 84101-2020

F. Mark Hansen (fmhlaw@comcast.net)
431 North 1300 West
Salt Lake City, UT 84116

Kim R. Wilson (krw@scmlaw.com)
David Pinkston (dlp@scmlaw.com)
P. Matthew Cox (mcox@scmlaw.com)
Snow Christensen & Martineau
10 Exchange Place, 11th Floor
Salt Lake City, UT 84111

Peter W. Guyon (pguyon@yahoo.com)
614 Newhouse Bldg.
10 Exchange Place
Salt Lake City, UT 84111

Carl E. Kingston (carlkingston@yahoo.com)
3212 South State
Salt Lake City, UT 84115

David Kingston (davidekingston@yahoo.com)
3212 South State
Salt Lake City, UT 84115

Mark W. Dykes (mdykes@parsonsbehle.com)
Parsons Behle & Latimer
201 South Main, Suite 1800
Salt Lake City, UT 84145

Kevin Anderson (kanderson@fabianlaw.com)
David R. Hague (dhague@fabianlaw.com)
Fabian & Clendenin
215 South State, 12th Floor
Salt Lake City, UT 84151-0210

Edward C. Meade (ecmeade@tva.gov)
Richard E. Riggs (reriggs@tva.gov)
Tennessee Valley Authority
Office of the General Counsel
400 West Summit Hill Drive (WT 6A)
Knoxville, TN 37902

Russell S. Walker (rwalker@wklawpc.com)
Woodbury & Kesler
265 East 100 South
Suite 300
Salt Lake City, UT 84111

George B. Hofmann (gbh@pkhlawyers.com)
Melyssa D. Davidson (mdd@pkhlawyers.com)
Parsons Kinghorn & Harris
111 East Broadway, 11th Floor
Salt Lake City, UT 84111

Jeffrey L. Shields (jlshields@cnmlaw.com)
Callister Nebeker & McCullough
Zions Bank Building, Suite 900
10 East South Temple
Salt Lake City, UT 84133

Danny C. Kelly (dckelly@stoel.com)
Stoel Rives LLP
One Utah Center
201 South Main Street, Suite 1100
Salt Lake City, UT 84111

David E. Leta (dleta@swlaw.com)
Douglas P. Farr (dfarr@swlaw.com)
Snell & Wilmer
15 West South Temple, Suite 1200
Salt Lake City, UT 84101-1547

Adelaide Maudsley (maudsley@chapman.com)
Brandon C. Paul (paul@chapman.com)
Chapman and Cutler LLP
201 South Main Street, Suite 2000
Salt Lake City, UT 84111

/s/ Glenn R. Bronson